## COMMONWEALTH vs. ROBERT ROY.

Bristol. December 7, 2012. - April 11, 2013.

Present: IRELAND, C.J., SPINA, BOTSFORD, GANTS, & LENK, JJ.

*Homicide. Practice, Criminal,* Capital case, Argument by prosecutor, Instructions to jury. *Malice. Evidence,* Relevancy and materiality, Consciousness of guilt.

At a murder trial, the testimony by a medical examiner regarding the cause of the victim's death was not speculative. [822-823]

The evidence at a murder trial supported the defendant's conviction of murder in the first degree on a theory of extreme atrocity or cruelty [823-824]; further, where the Commonwealth presented evidence that the victim was assaulted in a single attack that led to her death, it was not required to prove that each potential manner of death occurred with malice [824-826].

At a murder trial, there was no error in the admission of a recording of the defendant's jailhouse telephone calls, in which the defendant discussed a bloodstain on his jacket and made statements concerning its nature and origin, where the relevance of the evidence outweighed any prejudicial impact, which was minimized by the judge's admission of only a small portion of the recording and his instructions to the jury. [826-829]

At a murder trial, certain objected-to remarks in the prosecutor's closing argument were properly grounded in, or reasonably inferred from, evidence introduced at trial. [829-831]

There was no merit to a criminal defendant's argument that certain remarks in the prosecutor's closing argument, to which the defendant did not object, were either untrue or mischaracterizations of evidence introduced at trial. [831-835]

At a murder trial, there was no error in the judge's instructions to the jury on the Commonwealth's burden to prove the elements of the crime beyond a reasonable doubt, in which the judge informed the jury that they were permitted but not required to infer that the defendant had used a weapon. [835-836]

INDICTMENT found and returned in the Superior Court Department on December 5, 2007.

The case was tried before *Robert J. Kane,* J.

*Charles K. Stephenson* for the defendant.

*Eva M. Zelnick,* Assistant District Attorney, for the Commonwealth.

IRELAND, C.J. On February 25, 2010, a jury convicted the defendant, Robert Roy, of murder in the first degree of his wife on the theory of extreme atrocity or cruelty.[1] The murder was alleged to have occurred in March, 1986. Represented by new counsel on appeal, the defendant asserts that a reduction in the verdict is required because there was insufficient evidence to support the jury's verdict of murder by extreme atrocity or cruelty. He also argues error in the admission of evidence, the prosecutor's closing argument, and the jury instructions, and seeks relief pursuant to G. L. c. 278, § 33E. Because we conclude that no error requires a new trial and discern no reason to exercise our power pursuant to G. L. c. 278, § 33E, we affirm.

*Background.* We recite the facts the jury could have found, reserving certain details for our discussion of the issues raised. See *Commonwealth* v. *Belcher*, 446 Mass. 693, 694 (2006).

The victim, who was nineteen years old when she disappeared in March, 1986, married the defendant in December, 1984. She and the defendant had a volatile relationship.[2] Sometime in the late fall of 1985, the victim separated from the defendant and moved into her mother's home in Acushnet. She would see the defendant periodically after their separation, and the defendant at one point stayed in the cellar at his mother-in-law's home, without his mother-in-law's knowledge. There were numerous times that neighbors saw the defendant cross their yards to get to the victim's mother's home. Once there, the defendant sat on the back steps or looked in the windows. This behavior continued until the victim disappeared. In February, 1986, the defendant took his sister's vehicle without her permission and followed the victim to New Bedford. He was involved in an accident on the way and abandoned the damaged vehicle at the scene.

During their separation, the defendant was jealous of other men he saw with the victim. He asked the victim's sister about the victim's whereabouts and her clothing. The defendant physically attacked one man who had dropped the victim off after her evening waitressing shift and told him that he and the victim

---

[1] The Commonwealth also had proceeded under a theory of deliberate premeditation, but the jury did not find the defendant guilty under that theory.

[2] The defendant and the victim frequently argued and had physical altercations.

were trying to make their relationship work. The night before the victim's disappearance, the defendant vandalized the vehicle of another man whom the victim had been dating.

At approximately noon on March 4, 1986, the victim visited a neighbor, repaid some of the money she owed her, and told her she would pay the outstanding twenty dollars the next day because she was working that night. After returning home a few minutes later, the victim informed her mother that she was going out to meet the defendant, who had telephoned her that morning.

The victim and the defendant met in a nearby field. The victim did not return. Later that evening, the victim's sister saw the defendant at her mother's home, looking "flushed . . . like he had been running." He retrieved his belongings from the cellar, telling the victim's sister, "The cops are after me."

Two days later, the victim's sister and mother found the victim's Nike brand sneakers and socks in a culvert near the field. They filed a missing person report that day.[3] Police conducted multiple search efforts to find the victim; the defendant did not participate. He also fled from the police on several occasions when police tried to speak with him. On March 10, 1986, police were able to contact and question the defendant, who admitted that, on the day the victim disappeared, he had telephoned and asked her to meet him in the field. He told police that they had met there and talked, and although the defendant wanted to continue their relationship, the victim told him she was going to go to Florida with someone named Kevin. During the course of the initial investigation, police tested the defendant's denim jacket, which had a reddish-brown stain, for blood.[4] Police also took possession of a white pullover sweatshirt, similar to the one the victim wore on the day of her disap-

---

[3]While walking to the culvert, the victim's sister noticed footprints. One set of footprints had the imprint of a Nike brand sneaker, and the other set had a clover imprint similar to that of the defendant's boots. The prints were side by side until one set ended. When the area was secured, however, the prints were not distinguishable.

[4]When police tested the stain for human blood in 1986, the result was positive, but when the stain was retested in 2007, the test for human blood was inconclusive. A State police criminologist testified that the negative results were unsurprising because blood decomposes over time. In 2007, a partial deoxyribonucleic acid (DNA) profile from saliva was taken from a stamp

pearance, that was found in the woods approximately one month after the victim disappeared.

On March 30, 1986, the defendant told his friend he was moving to Florida and requested help in "moving some stuff." They put a rolled up and tied rug into the bed of the friend's truck. The defendant instructed his friend to drive in a manner whereby other vehicles would not see the truck's contents. They stopped at a quarry in Dartmouth, a local swimming place, lifted the rug from the truck bed, and placed it in the water. The defendant made sure the rug was submerged in deeper water. As they drove away, the defendant said, "See ya, bitch." The defendant threatened to kill his friend's pregnant wife if he told anyone what they had done.

The defendant moved to Florida, where he lived for some time. While out of State, he maintained contact with the friend who had helped him move the rug, and whom he telephoned approximately one month after he moved to inquire whether anything was in the newspaper. The defendant also asked him to "get rid of" a cement cinder block that was in his friend's yard. At some point, the defendant returned to Massachusetts, where he admitted to two people to killing the victim and disposing of her body.

In April, 1990, divers found the victim's partially skeletonized remains in the quarry in Dartmouth. The victim's body was in a sitting position suspended in the water, and her legs were bound together by a rope attached to a cement block laying at the bottom of the quarry. The rope connecting the victim's body to the cinder block had been looped twice around the victim's knees, with the other end tied off to one of the outer holes of the cinder block.

Subsequent dives recovered some of the victim's bones, in-

recovered from a letter the victim had sent to a friend, and compared with the sample from the jacket. This test showed that the DNA from the stain on the jacket matched the DNA on the stamp. One in 16,480 unrelated people in the Caucasian population would be expected to have the same partial profile as that on the stamp and the jacket. The statistical analysis of the DNA testing was presented to the jury. See *Commonwealth* v. *Lanigan*, 419 Mass. 15, 20 (1994) (evidence of DNA match "meaningless without evidence indicating the significance of the match"). The defendant does not contest the DNA evidence.

cluding her fractured jaw and skull,[5] as well as remains of a chair and parts of the victim's clothing, including a white shirt collar.[6] The medical examiner, who had performed the autopsy on the victim, testified that the victim died as a result of blunt force trauma to the head.[7]

No new evidence came to light until 2007, when police, who were interviewing former Acushnet residents living in Florida, learned of one of the defendant's confessions. On December 5, 2007, a Bristol County grand jury returned an indictment charging the defendant with murder. While detained and awaiting trial, the defendant discussed the victim with another inmate.

The defendant, who did not testify at trial, offered a theory of defense that someone else, such as a stranger or someone dating the victim, had killed, and perhaps sexually assaulted, the victim and dumped her body in the quarry. Based on the defendant's statement to police that the victim had told him she was going to Florida with someone named Kevin, and a witness who testified he saw the victim in Florida more than one year after her disappearance, defense counsel also argued in the alternative that the victim had run away. Further, counsel suggested that the police investigation had been inadequate, that the defendant had been targeted by police, and that the defendant's admissions did not amount to a confession. He also asserted that the evidence of a broken jaw and fractured skull did not warrant a conviction of murder in the first degree based on a theory of extreme atrocity or cruelty.

*Discussion. 1. Admission of medical examiner's testimony.* The defendant argues that the medical examiner's testimony was speculative because there was no statement as to what caused the blunt force trauma to the victim's skull. A medical examiner's testimony is not speculative where the testimony is

---

[5]Based on the victim's dental records, a forensic odontologist identified the jaw and skull as those of the victim.

[6]The day of her disappearance, the victim was wearing a navy blue rugby shirt with a white collar and jogging pants.

[7]The medical examiner's duties were made more difficult because of the decomposition of the victim's body. Although his common practice is to examine the hyoid bone in the upper part of the neck to determine the presence or absence of trauma, such as injury caused by strangulation, the victim's hyoid bone was not recovered from the quarry where the victim was found.

based on a reasonable degree of medical certainty and his or her experience and knowledge. See *Commonwealth* v. *Rodriguez*, 437 Mass. 554, 563 (2002); *Commonwealth* v. *Nadworny*, 396 Mass. 342, 358 (1985), cert. denied, 477 U.S. 904 (1986). There was no error. Here, the medical examiner testified that there could have been several potential causes of the victim's injuries, but that the cause of death was blunt force trauma to the head.

The medical examiner testified as follows: the victim's skull had a four- to five-inch fracture on the outer plate and inner plate of her skull at the back of her head. He stated that "[c]onsiderable" force was required to fracture a skull in that manner, and the impact resulting in such a fracture would "cause the brain to react," rendering a person unconscious and ultimately causing death in "seconds, minutes, hours, [or] days." The skull fracture could have been caused by "some force applied" to the head by a flat solid object such as "a floor," "a board," "a tree," "a rock," or "the ground."

The victim's jaw was fractured in a manner consistent with a punch to the front or side of the face. The jaw and skull fractures were "consistent with two separate impacts," both of which would be caused by "considerable force" but were not consistent with an impact with water. The jaw and skull fractures were on the same side of the body, indicating that the head wound was not the result of a fall caused by being punched in the jaw. The victim's lower torso was in a seated position, with her knees at an angle, as though she were sitting.[8]

Here, the medical examiner's testimony was based on a reasonable degree of medical certainty and his experience and knowledge. There was no error in the admission of the medical examiner's testimony. See *Commonwealth* v. *Rodriguez, supra*; *Commonwealth* v. *Snell*, 428 Mass. 766, 779, cert. denied, 527 U.S. 1010 (1999).

2. *Sufficiency of the evidence.* The defendant asserts that the evidence does not support a conviction of murder in the first degree on the theory of extreme atrocity or cruelty. A jury can consider several factors to determine whether a murder was

---

[8]When divers recovered a chair from the quarry in the general area where the victim's body was found, the chair was partially intact, with the wood still hard to the touch.

committed with extreme atrocity or cruelty: "[1] indifference to or taking pleasure in the victim's suffering, [2] consciousness and degree of suffering of the victim, [3] extent of physical injuries, [4] number of blows, [5] manner and force with which delivered, [6] instrument employed, and [7] disproportion between the means needed to cause death and those employed." *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227-228 (1983). If the jury find even one of these factors, they may establish that the murder was committed with extreme atrocity or cruelty, *Commonwealth* v. *Young*, 461 Mass. 198, 204 (2012), citing Model Jury Instructions on Homicide 14 (1999), and "[b]ecause they are not elements of the offense, unanimity is not required." *Commonwealth* v. *Moses*, 436 Mass. 598, 606 (2002).

The defendant first argues that the *Cunneen* factors are vague and arbitrarily applied and therefore have resulted in a violation of his constitutional due process rights. We addressed this issue in *Commonwealth* v. *Moses*, *supra*, where we concluded that the factors do not violate a defendant's constitutional rights. Here, at least three *Cunneen* factors (the victim's consciousness and degree of suffering, the manner and force causing the victim's physical injuries, and the defendant's indifference to or taking pleasure in the victim's suffering) were among the reasonable inferences a rational jury could make.

The defendant next asserts that the Commonwealth did not meet its burden to prove that he killed the victim with extreme atrocity or cruelty because it offered three separate reasons for the victim's death, and because evidence of a broken jaw and skull fracture does not warrant a conviction of murder committed with extreme atrocity or cruelty.

A conviction may be based on circumstantial evidence and the permissible inferences drawn therefrom. *Corson* v. *Commonwealth*, 428 Mass. 193, 197 (1998). A permissible inference is one that is "reasonable and possible"; it need not be "necessary or inescapable." *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). "Whether an inference is warranted or is impermissibly remote must be determined, not by hard and fast rules of law, but by experience and common sense." *Commonwealth* v. *Lao*, 443 Mass. 770, 779 (2005), *S.C.*, 450 Mass. 215 (2007), and 460 Mass. 12 (2011), quoting *Commonwealth* v. *Giang*, 402 Mass. 604, 609 (1988).

There was ample evidence from which the jury reasonably could infer that the defendant murdered the victim with extreme atrocity or cruelty.[9] The defendant's admissions alone provide sufficient evidence that the defendant killed the victim with extreme atrocity or cruelty. The defendant told one witness that he became angry after finding the victim at a party, took her outside, drove her away, then "slammed her down . . . strapped her to [a] chair . . . taped her mouth shut [and] threw her in the . . . bottomless pit . . . where she won't be lying and playing games." While telling the witness what had occurred, the defendant mimicked the victim's pleading to return home and used his hands to indicate his actions of punching and shaking her. When the witness told the defendant that "bodies float," the defendant replied, "[N]ot this one. It's weighed down with a block." When speaking to an inmate while awaiting trial, he stated that the victim was "a lying cheating whore, and he couldn't take it anymore, so he choked her out [and] took her body for a swim." From these statements, the jury reasonably could infer that the defendant was indifferent to the victim's suffering. Moreover, his single admission that he "choked out," or strangled, the victim, supports a reasonable inference that the defendant was indifferent to or took pleasure in the victim's conscious suffering. See *Commonwealth* v. *Mejia*, 461 Mass. 384, 393 (2012) (verdict of murder committed with extreme atrocity or cruelty supported by evidence of death occurring after three minutes of strangulation).

Even without the defendant's admissions, there was sufficient physical evidence to support the conviction. The medical examiner's findings that the victim was hit in the back of the head with a hard, flat object, the blow causing death in "seconds, minutes, hours, [or] days," is not only evidence of the defend-

___

[9]The judge properly instructed the jury on inferences. Prior to the presentation of evidence, the judge instructed the jury on circumstantial evidence and the need to make reasonable inferences based on the evidence. During the trial, the judge stated, "This case is going to go through a number of days, and you're going to hear testimony from a lot of people. You're going to see a lot of exhibits. And it's at the end of the case that you look at any linkages, if there are linkages, and then I will instruct you on what I refer to as drawing reasonable inferences." He also instructed the jury that an inference must be based in evidence that the jury believes, and that the inference must be "reasonable, and as such, not a guess."

ant's indifference to the victim's conscious suffering, but also evidence of the excessive manner and force by which the physical injuries were inflicted. See *Commonwealth* v. *Podkowka*, 445 Mass. 692, 698 (2006) (reasonable inference of extreme atrocity or cruelty where jury could infer victim experienced severe pain when no single blow to victim's head caused unconsciousness); *Commonwealth* v. *Anderson*, 445 Mass. 195, 201-202 (2005). The jury also reasonably could have inferred that the 240-pound defendant tied the victim, who was "petite," to a chair, and then beat her such that she sustained injury to her jaw and skull and threw her into the quarry. See *Commonwealth* v. *Raymond*, 424 Mass. 382, 383, 390 (1997).

The defendant argues that the Commonwealth presented inconsistent "competing hypotheses" of the victim's death and needed to prove that each potential manner of death occurred with malice. This argument is unavailing because the Commonwealth presented evidence that the victim was assaulted in a single attack that led to her death, not three separate incidents, and the medical examiner testified, based on physical evidence, that the cause of death was blunt force trauma to the skull.

3. *Admission of defendant's jailhouse telephone call recordings.* At trial, the Commonwealth introduced evidence that the defendant's jacket had a blood stain that matched the victim's deoxyribonucleic acid (DNA). Over the defendant's objection, the judge admitted a portion of an April 14, 2008, telephone call between the defendant and a woman, made while the defendant was incarcerated and awaiting trial. In the recording, the defendant discussed the stain on his jacket and made statements concerning its nature and origin.[10] The defendant argues that the admission of this evidence amounted to prejudicial error because

---

[10]The portion of the telephone call in the recording admitted at trial is as follows:

THE CALLER:       "All right. You got your jacket, and there's some blood on it."

THE DEFENDANT: "Yeah."

THE CALLER:       "Because the blood on the jacket is your blood. You licked the stamp. You mailed the letter."

THE DEFENDANT: "Yeah. Well, that's what I'm thinking the same thing too. You know, something to that effect, you know."

its relevance was outweighed by its prejudicial effect. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994); *Commonwealth* v. *Dunn*, 407 Mass. 798, 807 (1990).

The defendant's conversation addressed the issue whether the stain on the jacket was relevant because it implicated the defendant in the victim's murder. See *Commonwealth* v. *Valentin*, 420 Mass. 263, 270 (1995), quoting *Commonwealth* v. *Dunn*, *supra* ("Evidence is relevant if it has a rational tendency to prove a material issue"). The defendant was hypothesizing about how blood came to be on his jacket and was speculating about how

| | |
|---|---|
| THE CALLER: | "And the blood on the jacket is your blood, and you licked the stamp and mailed it for her." |
| THE DEFENDANT: | "It's very possible." |
| THE CALLER: | "And why the letter and the blood on the jacket? I'm like, oh my God, the blood on the jacket is his." |
| THE DEFENDANT: | "Yeah, it probably freaking is, but I mean at this point, who knows?" |
| THE CALLER: | "I'm glad you had the jacket on you when you got in the car accident. You got hurt in the car accident, and it's like that's why it matches." |
| THE DEFENDANT: | "I believe the blood that's on my jacket is from before, a long time before she disappeared. A long time. This must be some detergent or something, some soap or something that's on here. I don't know. But I guarantee you I'm a hundred percent sure that the jacket's been washed at least once. At least." |
| THE CALLER: | "Yeah." |
| THE DEFENDANT: | "And you know, it wasn't after she disappeared because I didn't have the jacket. They found it in Stevie's garage." |
| THE CALLER: | "Right, right, right." |
| THE DEFENDANT: | "The whole thing is just [pause] I couldn't have washed it because I had no place to live. Where did I wash it, you know? That's my point there. You know what I mean? That's why I'm . . . ." |
| THE CALLER: | [interjecting] "Yeah, what did you do, wash it and throw it back in the garage?" |
| THE DEFENDANT: | "Yeah, right. Exactly. Where did I wash it? I was living, you know, in people's cellars and shit." |

the results of the DNA testing might be explained away. His statements indicate consciousness of guilt. Moreover, the recording was not cumulative of other evidence. The recording presents the defendant's admissions concerning the stain on his jacket, which he categorizes as blood. This information is not repetitive of the State police criminologist's testimony about testing the stain. See *Commonwealth* v. *Brown*, 449 Mass. 747, 770 (2007), quoting *Commonwealth* v. *Carroll*, 439 Mass. 547, 553 (2003) ("judge may exclude evidence that is 'cumulative, repetitive, or confusing' ").

Admission of the recording did not unduly prejudice the defendant. "[W]hether the probative value of relevant evidence is outweighed by its prejudicial effect [is a] question[] within the sound discretion of the judge." *Commonwealth* v. *Martinez*, 431 Mass. 168, 174 (2000). It is clear that the judge "considered the duty of the Court to engage in a weighing calculation." He reflected on potential prejudice to the defendant when he discussed with counsel, outside the presence of the jury, the "most direct way, the least prejudicial way to introduce the calls." The judge relied on his "knowledge of the case as a whole," viewed the conversation "in the context of other calls," and admitted only a small portion of the recording to ensure evidence not relevant to a material issue was excluded and to minimize any prejudicial impact. Further, the jury could have credited the defendant's admission, "I believe the blood that's on my jacket is from before, a long time before she disappeared," as a truthful statement, in which case the admission of the recording could have bolstered the jury's belief in the defendant's innocence. There was no error. See *Commonwealth* v. *Simpson*, 434 Mass. 570, 578-579 (2001) (evidentiary rulings are "entrusted to the trial judge's broad discretion and are not disturbed absent palpable error").

Moreover, to the extent that the recording reminded the jury that the defendant had been incarcerated, any potential prejudice would have been adequately cured by the judge's instruction. The judge stated, "[T]he fact that the defendant may have been held awaiting trial means nothing. Nothing. Absolutely nothing. Because that's the law. The law is that it's presumed that he will be held. And so you can't of course hold that against him.

That has nothing to do with his presumption of innocence. It has nothing to do with his right to a fair trial. It is irrelevant, and you cast it from your minds." "Jurors are presumed to follow a judge's instructions," *Commonwealth* v. *Williams*, 450 Mass. 645, 651 (2008), and we presume they followed the instructions here.

4. *Prosecutor's closing argument.* The defendant next asserts that the prosecutor "misuse[d]" the evidence in his closing argument, creating impermissible inferences that appealed to jurors' emotions. We view the prosecutor's remarks "in light of the 'entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.'" *Commonwealth* v. *Ortiz*, 463 Mass. 402, 415 (2012), quoting *Commonwealth* v. *Raposa*, 440 Mass. 684, 694 (2004). The defendant's argument that these errors warrant a reversal of his conviction is unavailing. See *Commonwealth* v. *Vuthy Seng*, 436 Mass. 537, 556, cert. denied, 537 U.S. 942 (2002), *S.C.*, 456 Mass. 490 (2010).

a. We review the following statements to which the defendant objected to determine whether there was prejudicial error. *Commonwealth* v. *Flebotte*, *supra* at 353, quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983), (error nonprejudicial if "the conviction is sure that the error did not influence the jury, or had but very slight effect").

First, the defendant challenges the prosecutor's remark that the victim was "begging for her life." The prosecutor stated, "How would [the witness] know that [the defendant] was using those words to describe how he killed her and the method he killed her when she's essentially begging for her life? And how [the witness] then talked about the number of blows."

In closing argument, "[p]rosecutors are entitled to marshal the evidence and suggest inferences that the jury may draw from it." *Commonwealth* v. *Drayton*, 386 Mass. 39, 52 (1982). Those inferences need only be reasonable and possible. *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). Here, the prosecutor's closing remarks were based on a witness's testimony that the defendant mimicked the victim's repeated request to go home while he was shaking her and beating her. There was no error.

We also find no merit in the defendant's assertion that the

prosecutor's remarks concerning the rug were error because no rug was found and there was no testimony as to the buoyancy or the decomposition of the rug. The prosecutor stated, "[W]hy would a rug if you rolled it up, throw it in the water, why would that sink to the bottom? Why? . . . Everything is buoyancy. Clothing or something of that type of material, maybe eventually over time it will sink down." With this statement, the prosecutor refers to the testimony concerning the braided rug made from natural fibers that the defendant threw into the quarry. It is not an unreasonable inference that this type of rug, thrown into water, would decompose over time.

The defendant also challenges the prosecutor's use of one witness's testimony about the rug, specifically that the defendant and the witness moved the rug out of the truck, and that the defendant moved the rug further into the water. The prosecutor's statement is firmly based on the witness's testimony. If there were conflicting inferences that could be made from that witness's testimony, "it is for the jury to determine where the truth lies." *Commonwealth* v. *Lao*, 443 Mass. 770, 779 (2005). The prosecutor's statement was not error.

Citing *Commonwealth* v. *Coren*, 437 Mass. 723, 732 (2002), the defendant asserts that it was prejudicial error for the prosecutor to employ hypothetical dialogue that showed the defendant's hostility toward the victim. He challenges the prosecutor's statement, "[The victim's] out there working. And of course what does she get when she comes home? Hostility. 'Who you seeing? Who you talking to? Who you doing this with?' "

Hypothetical dialogue is prejudicial where it goes to the heart of the case and is not based on evidence offered at trial. *Id.* at 732-733. Here, the prosecutor relayed testimony that, after the victim moved back to her mother's home, the defendant asked the victim's sister questions about the victim's whereabouts, whom the victim was with, and what the victim was wearing. The prosecutor's dialogue is nearly identical to the testimony of the victim's sister. Further, the prosecutor's references to the defendant's hostility can be reasonably inferred from evidence of the violence that the defendant exhibited toward the victim and the defendant's admission that he was jealous of other men

whom the victim dated.[11] The prosecutor's statements remained properly grounded in the evidence. See *Commonwealth* v. *Corriveau*, 396 Mass. 319, 337 (1985).

The defendant objected at trial to the prosecutor's statement that the defendant was one of two people who knew "precisely how it happened that day in the field." The defendant's argument that the statement shifted the burden of proof to the defendant is unpersuasive because the defendant told police that he had met the victim in the field the day of her disappearance. Moreover, the judge issued multiple instructions on the presumption of innocence and the Commonwealth's burden to prove the elements of the crime, which would have cured any potential prejudice.

b. Concerning the remaining challenges to the prosecutor's closing argument to which the defendant did not object, we review for a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Ortiz, supra.* The defendant argues, in essence, that the statements that follow are "untrue" or mischaracterizations of evidence in contravention of *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987) (in closing argument, prosecutor should not misstate evidence).

"Counsel may . . . attempt to assist the jury in their task of analyzing, evaluating, and applying evidence. Such assistance includes suggestions by counsel as to what conclusions the jury should draw from the evidence." *Commonwealth* v. *Ferreira*, 381 Mass. 306, 316 (1980). We review the prosecutor's argument in the context of the whole argument and the jury instructions.[12] *Commonwealth* v. *Phillips*, 452 Mass. 617, 630 (2008). We note that most of the defendant's arguments concerning the prosecutor's statements are premised on our accepting an inference more favorable to the defendant, not on what constitutes permissible argument. See *Commonwealth* v. *Kozec, supra.* All of the challenged statements are firmly based in

---

[11]The jury also could have reasonably inferred hostility on the part of the defendant through testimony that the victim's clothes were cut into pieces when the victim and the defendant lived together.

[12]The judge instructed the jury that they were "not required to draw such inferences, and . . . should not do so unless they appear to be reasonable in light of all the circumstances in the case." His charge included at least three other instructions on making inferences.

evidence. See *Commonwealth* v. *Pope*, 406 Mass. 581, 587 (1990) (prosecutors must tailor remarks to ensure they remain properly grounded in evidence).

The prosecutor stated that the victim was "scared" and "barefoot" when, at some point, she left the apartment that she shared with the defendant. This remark is based on testimony that a witness saw her not wearing shoes and that her demeanor was "agitated, nervous, upset," as well as other testimony that the victim was afraid when the defendant beat her. Moreover, even if this had been error, the prosecutor's comment would not have produced undue sympathy or bias that rises to a substantial likelihood of a miscarriage of justice given all the evidence of the couple's volatile relationship. See *Commonwealth* v. *Marquetty*, 416 Mass. 445, 451 (1993) ("we assume that the jury have a reasonable measure of sophistication and are capable of sorting out hyperbole"). There was no error.

The prosecutor's statement that the defendant, but not the victim, was interested in continuing their relationship is based on evidence of the defendant's own admissions. In particular, the defendant told police that he believed the couple was "work-[ing] things out," but the victim "wasn't interested in getting back together." The jury also could have inferred that the victim did not wish to continue the relationship based on the victim's move from the apartment she shared with the defendant to her mother's home, and the defendant's violence toward her. The prosecutor's remarks were based in evidence, and the prosecutor was merely "arguing what conclusion the jury should draw from the evidence." *Commonwealth* v. *Ruiz*, 442 Mass. 826, 837 (2004).

We likewise find no error in the prosecutor's characterization of the violence in the relationship as "brutality." The defendant would like to characterize his pushing the victim against the wall and hitting her as a "scuffle," a word used by a witness to describe another incident. It is the jury's duty to determine which parts of a witness's testimony are credible. See *Commonwealth* v. *Deane*, 458 Mass. 43, 52 (2010). Given the defendant's own statement that he "used to beat [the victim] before, when he was drunk," evidence the defendant cut up the victim's clothes, and the testimony about the couple's violent arguments,

the prosecutor's statements are fairly inferable and fall within the permissible scope of a prosecutor's closing remarks. See *Commonwealth* v. *Raymond*, 424 Mass. 382, 389-390 (1997) (suffering of victim relevant to whether defendant's actions constituted extreme atrocity or cruelty).

There is also no merit in the defendant's claims that the prosecutor's characterizations of the defendant "lur[ing]" the victim to the field, lying in wait for her because he "knew what was going to come," misrepresent the evidence. The defendant told the police that he had telephoned the victim, asking her to meet him in the field, and that while he was waiting, he was lying down with his head propped up on his elbows. There was no error.

The defendant challenges the prosecutor's statement that "[the defendant] gets arrested for [an altercation with the police]. It's important. It's important because later on when he's telling everybody about why he's running, he's suggesting that somehow it has to do with the police. . . . Well, you heard from the clerk of the court. There was no warrant on him . . . . There was no process issued for him after February 25th of 1986." The defendant argues there is another interpretation of the evidence, namely, that the police were "out to get him." Because of this alternate interpretation, he argues, the prosecutor's closing remarks were in error. We disagree. Here, the prosecutor recounted the testimony of the victim's sister that the defendant arrived at her house and stated that "the cops [were] after [him]," even before the victim's sister knew her sister had disappeared, indicating consciousness of guilt. It is the jury's duty to determine "where the truth lies," *Commonwealth* v. *Lao*, 443 Mass. 770, 779 (2005), and the prosecutor's statement was not error.

The defendant also challenges the prosecutor's statement that the defendant dragged the victim's body to the culvert while it was still daylight. A prosecutor may argue forcefully "for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence." *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987). Based on the evidence of the victim's sneakers and socks discovered in the culvert, the jury could have reasonably inferred that the defendant moved the victim to the culvert to hide her, particularly because the victim had met the defendant around noon.

Next, the defendant claims that the prosecutor disparaged the defense's argument and appealed to the jury's emotions when he stated, "Sexual assault? What's the evidence of that? . . . Some weird crazy guy pops in that day, kills her, and then, okay, presumably leaves the body. Why take it ten miles? . . . Who says later on he made her disappear? Who says that? This unknown crazy rapist that's running around?" We presume the jury recognize the prosecutor's role as an advocate, not a witness. *Commonwealth* v. *Mitchell*, 428 Mass. 852, 857 (1999). The prosecutor's statement responds to defense counsel's suggestion that the victim had been sexually assaulted and killed by someone other than the defendant. He referenced the defendant's admission that he threw the victim in a "bottomless pit," reasonably inferred as the quarry in Dartmouth where the victim's body was found. Even if the remarks were embellishment, they were merely "excusable hyperbole" in light of the entire argument and do not provide grounds for reversal. See *Commonwealth* v. *Sanna*, 424 Mass. 92, 107 (1997).[13]

The defendant objects to the prosecutor's statement, "You need to consider all of the evidence, the evidence, not the supposition. Did you hear any evidence about needing a permit to run a truck up and down [Route] 195 on Easter Sunday? So why are we hearing that? That's not evidence." The defendant argues that the prosecutor's remarks were not based on evidence. Here, the prosecutor references the testimony of the witness who drove the defendant to the quarry on March 30, 1986 (Easter Sunday), with the braided rug in the back of the truck. The witness testified that while he and the defendant were driving to the quarry, they saw a commercial vehicle on the highway. During cross-examination, defense counsel elicited testimony from a police officer that one would need a permit to operate a commercial vehicle before 6 P.M. on a holiday such as Easter. The defendant suggests that the witness's credibility was at issue because the witness testified that he saw a commercial truck on the highway on a day when that truck would need a permit to operate. "Evaluations of credibility are. . . within the exclusive

[13]Throughout the trial and during jury instructions, the judge repeatedly instructed the jury to use intellect, not emotion, when evaluating the evidence and the arguments.

province of the trier of fact." *Commonwealth* v. *Bohannon*, 376 Mass. 90, 94 (1978), *S.C.*, 385 Mass. 733 (1982). When the prosecutor told the jury, "That's not evidence," he may have referred to evidence proving or disproving the defendant's guilt. The prosecutor's remarks are based in evidence, and there was no error.

Finally, the defendant objects to the prosecutor's remarks concerning the white pullover sweatshirt recovered in a wooded area similar to the one the victim wore on the day of her disappearance: "That coat. Consider this. That got stuffed, buried somewhere. There's dirt on it. Somebody knew the significance to this case, the same way [a witness] when she saw it knew it, and somebody didn't want to be involved, meaning call up the police and say . . . 'I just found a coat here,' but they wanted it to be found." The defendant argues that this statement intimates that the defendant "stuffed" the sweatshirt somewhere. However, regarding the phrase "got stuffed, buried somewhere," the prosecutor referred to one witness's testimony that the sweatshirt was found in an open area where it could be seen easily. The evidence indicates that the witness would have found it earlier had the sweatshirt been visible, so an inference that the sweatshirt was hidden, or "stuffed" somewhere, is reasonable. Second, the prosecutor's remarks concerning the dirt on the sweatshirt is a reasonable inference based on the sweatshirt itself, which was in evidence. These statements do not constitute error.

5. *Instruction on "dangerous weapon."* During his instruction to the jury on the Commonwealth's burden to prove the elements of the crime beyond a reasonable doubt, the judge stated:

> "In relation to malice, follow this instruction as to the use of a dangerous weapon. As a general rule, you the jury are permitted, but not required, to infer that a person who intentionally uses a dangerous weapon on another human being is acting with malice. A dangerous weapon is an item which is capable of causing serious injury or death. Excluded from the definition of a dangerous weapon is any part of the human body, such as a hand, a foot, or any other part of the body."[14]

---

[14]Following his instructions on malice related to the theory of extreme atrocity or cruelty, the judge instructed the jury to follow the same malice

The defendant contends that the judge's charge was error because, in essence, it allowed the jury to conclude that the defendant used a weapon. He argues that the prejudice was magnified because of the circumstances of the victim's death, the medical examiner's improper testimony, and the jury's sympathies, all of which led them to conclude that the defendant murdered the victim with malice.

Because the defendant did not object at trial, we review to determine whether there was a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Dostie*, 425 Mass. 372, 374 (1997). We determine whether there was error in a charge by "reading the charge as a whole, and not by scrutinizing bits and pieces removed from their context." *Commonwealth* v. *Cundriff*, 382 Mass. 137, 153 (1980), cert. denied, 451 U.S. 973 (1981). Here, the judge's instructions clearly told the jury that making inferences was permissible but not required. Given the evidence of the victim's fractured skull, the medical examiner's testimony that "considerable force" was needed to inflict that fracture, and that the fractures to the victim's skull and jaw were on the same side of the body, this instruction was proper. Additionally, the jury could have inferred from the defendant's request that his friend dispose of one specific cinder block approximately one month after the victim disappeared that the cinder block may have been the "considerable force" applied to the victim's head. There was no error.

6. *Cumulative effect of errors.* The defendant argues that his conviction requires reversal because of the cumulative effect of the errors at trial. Given our conclusions, there was no risk that any error requires reversal. See *Commonwealth* v. *Guy*, 441 Mass. 96, 109 (2004).

7. *Relief pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record as required by G. L. c. 278, § 33E, and we see no reason to reduce the murder conviction or order a new trial.

*Judgment affirmed.*

---

instruction as to murder in the second degree, but did not repeat the instruction itself.