NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-53

COMMONWEALTH

vs.

JAMES BENNETT.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a jury trial in the Superior Court, the defendant, James Bennett, was convicted of possessing a firearm without a license, subsequent offense, in violation of G. L. c. 269, § 10 (a), (d) (2015).[1]  In this direct appeal, the defendant claims reversible error in (1) the denial of his motion to suppress, (2) the trial judge's not conducting a voir dire of an allegedly sleeping juror, (3) the absence of a firearm licensure jury instruction, and (4) the prosecutor's closing argument.  We affirm.

_____

[1] Before trial, the defendant pleaded guilty to the charge of possession of a class B substance.  Following the jury's verdict of guilty of unlawful possession of a firearm, the defendant pleaded guilty to the subsequent offense portion of the firearm conviction.

Background.  We summarize the facts as found by the motion judge following an evidentiary hearing.  We note additional evidence presented at trial, reserving further facts for later discussion.

At just before 1 A.M., State police Trooper Adam Cardin, who testified at the evidentiary hearing, saw a black Ford Taurus on Interstate Highway 91 traveling only ten feet behind the car in front of it.  Smoke was coming from the hood of the Taurus, and the trooper heard a noise consistent with there being a hole in the exhaust.  The trooper followed the Taurus and saw the car's front and rear passenger's side tires cross over the white "skip-line."  At that point, the trooper activated his emergency lights and pulled over the Taurus.

Trooper Cardin positioned his cruiser right behind the Taurus, about ten feet from its two occupants; turned on his spotlight, illuminating the inside of the car; and approached the passenger's side.  When the trooper reached the car, he asked the driver, the defendant, for his license and registration.  The defendant said that he had a learner's permit, but that he did not have it with him.  The defendant handed the trooper a Massachusetts identification card, but did not have the car's registration.  The defendant told the trooper that the car belonged to a male friend from Connecticut.

Seeking to determine if the car could be driven away, Trooper Cardin then asked the passenger for her license, which he received.  The trooper explained that the defendant might not be able to continue driving if the trooper could not verify the defendant's learner's permit, or the car would need to be towed if the passenger did not have a valid license.  The defendant's demeanor, which the trooper testified had previously been "very calm," changed; the defendant suddenly seemed "not argumentative, but . . . very concerned," with a "glazed over look" on his face.

While the defendant and passenger stayed in the car, Trooper Cardin walked back to his cruiser to run a query on the defendant's driving status, the passenger's driving status, and the registration of the Taurus.  When he input the defendant's identification number,[2] the trooper received a notification showing that the defendant had a prior firearm conviction.[3]  At the motion hearing, Trooper Cardin testified that he did not

---

[2] The trooper testified on cross-examination that he queried the defendant's "driver's license number," which we conclude was a misstatement as the defendant had produced an identification card and said he had no driver's license.

[3] The motion judge further found that "[t]he query also indicated that the Taurus was registered to a female in Springfield."  The testimony reflected that this fact was determined "at some point."  Because it is not clear from the record when the trooper learned this fact, we do not consider it in our analysis.

remember the age of the firearm conviction. The arrest report attached to the defendant's motion to suppress stated that the defendant's firearm conviction was from February 3, 2003, but Trooper Cardin did not testify to this fact, and the motion judge did not find it.

The motion judge found that as Trooper Cardin ran the query in his cruiser, he noticed the defendant "moved his body in the seat but attempted to keep his head and torso still while facing forward." The defendant "then raised his shoulders, reached out, and made three motions toward the passenger side of the Taurus." The defendant's movements "were not natural and appeared to be an attempt to discard or retrieve something."

After seeing the defendant's movements, Trooper Cardin called for backup as he was concerned for his safety. He testified, "It's at that point being alone on the side of the road, seeing what's going on with the movements and then seeing prior convictions, it obviously brought some concern to me for my safety and well-being." He was also concerned because it was dark, it was the middle of the night, and the defendant's demeanor had changed.

Two additional troopers arrived within five minutes. Trooper Cardin approached the driver's side of the Taurus and issued an exit order to the defendant and passenger. A patfrisk of both revealed no contraband. The defendant and passenger

were moved to the guard rail next to the car.  Trooper Cardin entered the Taurus and inspected the center console, but did not find any contraband.  As the motion judge found, Trooper Cardin then "looked directly underneath the front passenger seat next to the center console and found a gun."

The defendant was handcuffed, arrested, and read Miranda warnings by Trooper Cardin.  Trooper Cardin searched the defendant before putting him in the cruiser and found a bag filled with what the trooper believed to be cocaine.

The motion judge concluded that the stop was lawful as it was based on Trooper Cardin's "observation that the vehicle was not maintaining a safe traveling distance, experiencing equipment malfunctions, and veered across the white line with two tires."  The motion judge also concluded that safety concerns justified the exit order.  The judge found reasonable the trooper's belief that the defendant or passenger was armed "based upon [the trooper's] observation of [the defendant's] change in demeanor, movements within the car, and [the defendant's] prior firearm conviction."  The judge also held that the trooper's protective sweep of the Taurus was "sufficiently limited in scope" and confined to the area in which the defendant was reaching.

After the motion judge denied the defendant's motion to suppress, the defendant was convicted at trial.  At trial, four

5

witnesses testified, including Trooper Cardin and State police Trooper Emily Nugent, who responded to Trooper Cardin's call for backup.  In particular, Trooper Nugent testified, without objection or cross-examination, that neither the defendant nor the passenger had either a license to carry a firearm or an FID card.  The defendant did not testify.  The defendant's timely appeal followed his conviction.

Discussion.  1.  Denial of motion to suppress.  "'In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error,' and we defer to the judge's determination of the weight and credibility to be given to oral testimony presented at a motion hearing."  Commonwealth v. Hoose, 467 Mass. 395, 399 (2014), quoting Commonwealth v. Contos, 435 Mass. 19, 32 (2001).  "[F]indings drawn partly or wholly from testimonial evidence are accorded deference, and are not set aside unless clearly erroneous," Commonwealth v. Tremblay, 480 Mass. 645, 655 (2018), and "[w]e conduct an independent review of the judge's application of constitutional principles to the facts found," Hoose, supra at 400.  Accord Commonwealth v. Catanzaro, 441 Mass. 46, 50 (2004).

There is no dispute that the initial stop of the defendant's car was valid.  See Commonwealth v. Santana, 420 Mass. 205, 207 (1995); Commonwealth v. Monell, 99 Mass. App. Ct.

487, 489 (2021). Rather, the defendant maintains that (1) Trooper Cardin unreasonably prolonged the stop by "immediately querying [the defendant's] criminal record," (2) the trooper impermissibly ordered the defendant to exit the car absent a reasonable belief that the trooper's safety was threatened, and (3) the limited search of the car for weapons exceeded its permissible scope. We are not persuaded.

a. Length of stop. "A routine traffic stop may not last longer than 'reasonably necessary to effectuate the purpose of the stop.'" Commonwealth v. Cordero, 477 Mass. 237, 241 (2017), quoting Commonwealth v. Amado, 474 Mass. 147, 151 (2016). "The nature of the stop, i.e., for a traffic offense, defines the scope of the initial inquiry by a police officer." Commonwealth v. Buckley, 478 Mass. 861, 873 (2018), quoting Commonwealth v. Bartlett, 41 Mass. App. Ct. 468, 470 (1996).

Here, Trooper Cardin's driving status query resulted in a "pop[] up" notification of the defendant's prior firearm conviction. The trooper's actions were tied to the traffic violations that were the basis of the stop. The trooper did not run a separate criminal records check. Thus, the stop was not unreasonably prolonged.

b. Exit order. An exit order is justified where the police "are warranted in the belief that the safety of the officers or others is threatened." Commonwealth v. Torres-

7

Pagan, 484 Mass. 34, 38 (2020). "[I]t does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns." Commonwealth v. Gonsalves, 429 Mass. 658, 664 (1999). "The justification for an exit order does not depend on the presence of an 'immediate threat' at the precise moment of the order, but rather on the safety concerns raised by the entire circumstances of the encounter." Commonwealth v. Stampley, 437 Mass. 323, 328 (2002). "A police officer need point only to some fact or facts in the totality of the circumstances that would create a heightened awareness of danger as to warrant an objectively reasonable officer in securing the scene in a more effective manner." Commonwealth v. Rosado, 84 Mass. App. Ct. 208, 212 (2013).

Here, Trooper Cardin first saw a marked change in the defendant's demeanor, from calm to concerned, after telling him that the car might need to be towed. Then the trooper saw the defendant make suspicious, unnatural movements, seeming to discard or retrieve something near the passenger. At the same time, a query of the defendant revealed a firearm conviction. It was the middle of the night and the trooper was alone. These facts caused "a heightened awareness of danger that would warrant an objectively reasonable police officer" to fear for

8

his safety.  <u>Monell</u>, 99 Mass. App. Ct. at 490, quoting <u>Stampley</u>, 437 Mass. at 326.  The exit order was lawful.

c.  <u>Limited search of car</u>.  "Where an officer has issued an exit order based on safety concerns, the officer may conduct a reasonable search for weapons in the absence of probable cause to arrest."  <u>Amado</u>, 474 Mass. at 152.  "Such protective searches are reasonable if 'confined to what is minimally necessary to learn whether the suspect is armed and to disarm him once the weapon is discovered.'"  <u>Id</u>., quoting <u>Commonwealth</u> v. <u>Almeida</u>, 373 Mass. 266, 272 (1977).  "We examine the facts not in isolation, but as they reasonably and objectively appeared in the context of the ongoing encounter."  <u>Rosado</u>, 84 Mass. App. Ct. at 212.

Here, "[o]nce the defendant was removed from the car and no weapon was discovered during the patfrisk of his person, the [troopers] were justified in their concern that a weapon might remain in the car."  <u>Monell</u>, 99 Mass. App. Ct. at 491.  The limited search of the car was brief and restricted to the area where the defendant had just been seen reaching.  The sweep of that area of the car was justified, not prolonged, and appropriately limited.

2.  <u>Juror concerns</u>.  The defendant further argues that the trial judge abused her discretion in not conducting a voir dire of a juror who may have been sleeping.  We are not persuaded.

9

During a sidebar on the first day of trial, the trial judge raised an "issue" that a juror "appeared to be sleeping." The judge stated that the juror "clearly was nodding off," so the judge had asked the court officer to "step over there, [and] maybe bang on the wall if it was necessary." The judge also stated that that was "why I dropped my book" and that "dropping the book woke [the juror] up." The Commonwealth suggested taking a break, but the judge stated that they would go "a little bit further" and then take a break, that she was "trying to keep an eye on it," and requested that the attorneys "keep an eye on it as well." Neither attorney objected to the proposed course of action or requested a voir dire of the juror. No one mentioned the issue again.

"[A] judicial observation that a juror is asleep, or a judge's receipt of reliable information to that effect, requires prompt judicial intervention." Commonwealth v. McGhee, 470 Mass. 638, 643-644 (2015), quoting Commonwealth v. Beneche, 458 Mass. 61, 78 (2010). Accord Commonwealth v. Dancy, 75 Mass. App. Ct. 175, 181 (2009). If the trial judge receives reliable information "suggesting that a juror was asleep or otherwise inattentive," Commonwealth v. Villalobos, 478 Mass. 1007, 1007 (2017), quoting McGhee, supra at 644, the appropriate intervention "typically involves 'conduct[ing] a voir dire of the potentially inattentive juror, in an attempt to investigate

10

whether that juror remains capable of fulfilling his or her obligation to render a verdict based on all of the evidence.'" Commonwealth v. Ralph R., 490 Mass. 770, 777 (2022), quoting Villalobos, supra at 1008. "Judges have substantial discretion in this area." McGhee, supra. "[N]ot every instance of juror inattentiveness calls for a voir dire." Ralph R., supra at 778.

Where, as here, the defendant contends that the trial judge's response was inadequate, "[t]he burden is on the defendant to show that the judge's response to information about a sleeping juror was arbitrary or unreasonable." Villalobos, 478 Mass. at 1008, quoting McGhee, 470 Mass. at 644. Because the defendant did not object at trial, we review to determine whether any error created a substantial risk of a miscarriage of justice. See Ralph R., 490 Mass. at 785-786.

The defendant has not met his burden. After observing the juror "nodding off," the trial judge reacted appropriately and promptly by making a loud noise that "woke [the juror] up." See Ralph R., 490 Mass. at 778 (judge's failure to conduct voir dire of juror with head down and eyes closed was not abuse of discretion where judge intervened by asking jury if they could see screen and noted juror was looking "within seconds" of intervention). She also asked a court officer to make a loud noise if necessary, said she would "keep an eye on it," and

11

instructed counsel to do the same.  There was no abuse of discretion.

As to the defendant's argument that the juror's "lapse in alertness . . . spanned important aspects" of Trooper Cardin's testimony, that contention is speculative.  The record does not show that the trial judge, or any party, saw the juror being inattentive for a long time, or that the juror had indeed been sleeping.  See Dancy, 75 Mass. App. Ct. at 182.  See also Commonwealth v. Alleyne, 474 Mass. 771, 778 (2016) (absence of objection and agreement to judge's plan regarding juror "struggling to stay awake . . . indicat[ed] that neither [party] considered the suggestion of monitoring to be particularly prejudicial").  Contrast McGhee, 470 Mass. at 645 (reliable report of juror snoring loudly during testimony of two victims required inquiry).

3.  Jury instruction on licensure.  We are similarly unpersuaded by the defendant's contention that he is entitled to a new trial because the trial judge did not instruct the jury that the lack of licensure is an essential element of unlawful possession of a firearm.  See Commonwealth v. Guardado, 493 Mass. 1, 2-3, 6-8, 12 (2023), cert. denied, 144 S. Ct. 2683 (2024) (Guardado II).[4]

_____

[4] This court stayed the briefing in this appeal pending the decision in Guardado II.

12

We must determine whether the absence of a licensure jury instruction "was harmless beyond a reasonable doubt." Commonwealth v. Bookman, 492 Mass. 396, 401 (2023), quoting Commonwealth v. D'Agostino, 421 Mass. 281, 287 (1995).  It was. Here, as in Bookman, 492 Mass. at 401, the Commonwealth presented uncontested evidence, in the form of Trooper Nugent's testimony, that the defendant did not have a license to carry a firearm.[5]  It was not necessary that the defendant admit to not having a license.  See id. (police officer's undisputed testimony that neither defendant nor codefendant had license for firearm rendered lack of instruction harmless where officer's credibility was not in question).  Indeed, although we do not rely on the point, it is very unlikely that the defendant could have disputed Trooper Nugent's testimony because the defendant is prohibited by his prior criminal record from being permitted a license to carry a firearm.  See G. L. c. 140, § 131 (d) (2018).

To the extent that the defendant maintains that Guardado II renders this uncontested evidence inadequate, we decline to so

---

[5] Trooper Cardin also testified that the defendant did not have a license to carry a firearm or an FID card.  On appeal the defendant suggests that his attacks on the credibility of Trooper Cardin's testimony about his observations rendered his testimony about licensure unreliable.  We need not resolve this point, given Trooper Nugent's testimony.

13

rule.[6]  Recent cases do not support such an interpretation.  See, e.g., Commonwealth v. Francis, 104 Mass. App. Ct. 593, 604 & n.13 (2024) (failure to instruct on licensure requirement harmless beyond reasonable doubt, and evidence sufficient, where detective gave uncontested testimony that defendant was not licensed to possess firearm).

Accordingly, the failure to instruct the jury on licensure was harmless beyond a reasonable doubt, and the defendant is not entitled to a new trial.

4.  Prosecutor's closing argument.  Finally, the defendant challenges the prosecutor's assertions in closing that the defendant had pulled the gun from "his person" or "his body" during the movements seen by Trooper Cardin.  We discern no error.

"In closing argument, '[p]rosecutors are entitled to marshal the evidence and suggest inferences that the jury may draw from it.'  Those inferences need only be reasonable and possible" (citations omitted).  Commonwealth v. Roy, 464 Mass. 818, 829 (2013).  We review to determine whether there was error and, if so, as the defendant did not object, whether the error

_____

[6] The defendant also maintains that we should not consider his failure to object to or dispute Trooper Nugent's testimony because, at the time of trial, he could not have been aware of the need to prove lack of licensure.  The same was true, however, in Bookman, 492 Mass. at 401, so we are unpersuaded by this argument.

14

created a substantial risk of a miscarriage of justice. See Commonwealth v. Daigle, 379 Mass. 541, 549 (1980).

At trial, Trooper Cardin testified that while he was running the query, he noticed that the defendant was moving his lower body while keeping his shoulders and head at the same height and still facing forward. The defendant then reached across to the front passenger's side with three distinct "tug-of-war movement[s] towards the passenger side over the center console seat" into the left-leg area of the front passenger's side. The passenger was not moving during the defendant's actions. The trooper also demonstrated the defendant's movements to the jury.

Trooper Cardin testified that after these movements, he was concerned for his safety. Minutes later, after backup arrived, a firearm was recovered on the floor between the front passenger's side seat and center console, where the trooper had seen the defendant move his hand and which was easily accessible to the defendant. The trooper also testified that firearms like the one in this case are commonly hidden in a waistband or undershirt.

In light of this testimony, the prosecutor's statements arguing that the defendant had the firearm "on his person" and on "his body," including the single statement that the defendant pulled the firearm from his waistband, were reasonable

15

inferences based on the evidence, and not error.  We note that the prosecutor twice stated that she "suggest[ed]," based on the facts in evidence, that the defendant had a firearm that he pulled from his person.  Seeing no error, we need go no further.

<u>Judgments affirmed</u>.

By the Court (Sacks, Shin & Hershfang, JJ.[7]),

Clerk

Entered:  May 12, 2025.

---

[7] The panelists are listed in order of seniority.