NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10988


COMMONWEALTH  vs.  HAROLD PARKER.



Suffolk.      September 12, 2018. - December 7, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Budd, & Kafker, JJ.


Homicide.  Kidnapping.  Search and Seizure, Clothing, Exigent
    circumstances.  Practice, Criminal, Capital case, Motion to
    suppress, New trial, Discovery, Argument by prosecutor,
    Assistance of counsel.  Evidence, Chain of custody.




    Indictments found and returned in the Superior Court
Department on December 20, 2001.

    A pretrial motion to suppress evidence was heard by Patrick
F. Brady, J., and the cases were tried before him; and motions
for a new trial and for posttrial discovery, filed on September
1, 2016, were considered by Christine M. Roach, J.


    Richard J. Fallon for the defendant.
    Helle Sachse, Assistant District Attorney (Patrick M.
Haggan, Assistant District Attorney, also present) for the
Commonwealth.


    BUDD, J.  On the morning of November 4, 2001, the body of

the victim, a twenty-one year old woman, was discovered in the

Charles River near the Boston side of the Boston University

footbridge. The defendant, Harold Parker, was convicted as a joint venturer of kidnapping and murder in the first degree in connection with the death.[1]

We consolidated his direct appeal with his appeal of the denial of his motions for a new trial and for posttrial discovery, and now affirm. Further, we decline to grant extraordinary relief pursuant to G. L. c. 278, § 33E.

Background. We summarize the facts the jury could have found, reserving certain details for discussion of specific issues. In the fall of 2001, an area adjacent to the main entrance to a public transit station in the Harvard Square area of Cambridge, known as "the Pit," was a gathering place for an assortment of young people, a number of them homeless. The victim and her boyfriend, Gene Bamford, were among those who congregated there.

In late October, 2001, the defendant and Ismael Vasquez,[2] who held themselves out as senior members of the "Crips" gang,

---

[1] Of the three codefendants, brothers Ismael Vasquez and Luis Vasquez were similarly charged and convicted, with Luis additionally being charged with and convicted of aggravated rape of the victim, and Scott Davenport was charged and convicted of murder in the first degree. Commonwealth v. Vasquez, 462 Mass. 827, 828 n.3 (2012).

[2] As Ismael Vasquez and his codefendant brother Luis Vasquez share a last name, hereafter we use their first names.

recruited prospective members at the Pit, including the victim, Bamford, Ana White, and Lauren Alleyne.

After an initiation ceremony, which took place in a nearby cemetery on Halloween night, Ismael, the defendant, and Bamford explained to the assembled group that they would be sent on "missions" to rob people. If a member failed to complete the mission, or otherwise failed to obey the leaders, that member would be given a "violation," that is, a beating. A third violation would result in that member's death. If the offending member could not be found, the gang would kill someone close to that member.

Beginning that night, members were sent on missions. When enough cash and credit cards had been collected, the group retired to a motel. There, "marriage" ceremonies were conducted in which Bamford was "married" to the victim, the defendant was "married" to Alleyne, and Ismael was "married" to White.

The next day, at a second meeting in the cemetery, Luis was introduced to the members as one of the leaders of the group. That day and the next, members again were sent out on missions. On November 2, members were to report to the motel where Ismael, Luis, and the defendant were waiting. The victim also remained at the motel because she was considered to be "child-like" and would be a burden to those on missions.

While in Harvard Square, members, including Bamford and Alleyne, learned that Ismael, Luis, and the defendant were not Crips. Instead, Ismael and Luis were purportedly members of the "Latin Kings" gang, and had been sent to organize a false "set" of Crips. Upon hearing this news, the group renounced their memberships; Bamford devised a plan to obtain a gun and rescue the victim, whom Bamford feared would be in danger once Ismael, Luis, and the defendant learned that members of the group had turned against them.

The next day, November 3, Alleyne returned to the motel to warn Ismael, Luis, and the defendant of Bamford's plan. Ismael arranged for Scott Davenport to provide transportation for the three men, the victim, Alleyne, and White (who had since rejoined the group) in exchange for heroin. The victim related to Alleyne and White a dream she had that she interpreted to mean that Bamford was going to betray Ismael, Luis, and the defendant. In turn, White told the men that the victim knew all along that Bamford was going to turn against them.

The group traveled to Cambridge, where the defendant told Alleyne and White that they were going to "get" the victim. The defendant instructed Alleyne and White that when they heard the phrase "green light" they were to pull the victim to the ground and hold her down as Davenport stabbed her. The defendant

further instructed Alleyne to wrap a bandanna around her hand in case the victim tried to bite.

As the women walked along the tracks of a railroad bridge that spanned the Charles River, Ismael shouted "green light." As planned, Alleyne and White pulled the victim to the ground; Davenport approached and stabbed the victim repeatedly, and then Luis ran to them and struck the victim in the head several times with a pair of "nunchucks."  Luis and Davenport then threw the victim's body into the Charles River.

The defendant and others were arrested hours later for kidnapping another individual whom they believed had turned against them.  While in custody, the defendant was questioned about the victim's death.  Among other things, the defendant told investigators that he knew that the victim would be killed and was against it, but that other members threatened to kill him and stripped him of his rank in the gang.  He also stated that he was approximately twenty feet away from where the victim was killed.  Later in the interview, when asked if he killed the victim, he responded, "You don't understand that someone at my level doesn't have to do any dirt work," and "[W]hen it comes to trial your witnesses won't make it."

Discussion.  In the direct appeal from his murder conviction, the defendant asserts error in the denial of his pretrial motion to suppress his clothing and in the prosecutor's

closing argument at trial. In the appeal from the denial of his motion for a new trial, the defendant alleges ineffective assistance of his trial counsel for failing to highlight irregularities in the handling of the defendant's clothing and asserts that had the jury been aware of the discrepancies, such knowledge may have made a difference in their verdicts.[3] We address the issues from each appeal.

1. <u>Motion to suppress</u>. The defendant claims that his motion to suppress evidence obtained from his clothing was improperly denied because there were no exigent circumstances justifying the warrantless seizure. We find no error.

We summarize the facts found by the judge who heard the motion to suppress, who was also the trial judge. See <u>Commonwealth</u> v. <u>Stephens</u>, 451 Mass. 370, 381 (2008). The defendant, the Vasquez brothers, and Davenport were arrested for kidnapping on Saturday, November 3, 2001, and held pending arraignment. The victim's body was discovered the next morning. On Monday morning, investigators received an anonymous tip that three individuals who had been arrested for kidnapping were involved in the victim's death. Based on the tip and other

---

[3] The defendant also moved for posttrial discovery. The judge who considered that motion did not err in denying it.

corroborating evidence,[4] a State police investigator had the defendant disrobe and seized his clothing while he was in custody awaiting arraignment.  The investigator subsequently returned the clothing to a court officer after a District Court judge instructed the investigator to discontinue the warrantless seizure.  The defendant's clothing was held with his other property, and later taken by the State police pursuant to a search warrant issued the following day.

"A reasonable belief as to the potential loss or destruction of evidence may create exigent circumstances permitting a warrantless . . . seizure of [that] evidence." Commonwealth v. DeJesus, 439 Mass. 616, 620 (2003).  See Commonwealth v. Figueroa, 468 Mass. 204, 213 (2014); Commonwealth v. Gentile, 437 Mass. 569, 573 (2002).  The defendant argues that exigent circumstances did not exist at the time his clothing was seized because he was in police custody at the time of the seizure and whether he would be released had not been determined.  We find this argument unpersuasive.

At the time of the initial seizure, the defendant was in custody awaiting arraignment on kidnapping charges and wearing the clothing in which he had been arrested.  Given that the

---

[4] The defendant does not challenge the judge's finding of probable cause; although we do not here recite all of the evidence available to the investigators at the time of the seizure, we agree that probable cause existed.

defendant's arrest occurred near the time of the murder, it was objectively reasonable to believe that there was a significant risk that the defendant might attempt to hide or destroy evidence of the crime that existed on his clothing while in custody, e.g., exchanging his clothes with another detainee or washing his clothes in a jail cell sink or toilet.  See Figueroa, 468 Mass. at 213 (exigent circumstances exist when "police have reasonable grounds to believe that obtaining a warrant would be impracticable under the circumstances because the delay in doing so would pose a significant risk that . . . evidence may be destroyed").  Further, it was unclear whether the defendant would be released from police custody, freeing him to hide or destroy any evidence on his clothing.  See id. at 214; Commonwealth v. Taylor, 426 Mass. 189, 195 (1997).  Thus, there was no error in denying the defendant's motion to suppress.[5]

2.  Prosecutor's closing argument.  The defendant claims that during the prosecutor's closing argument he made misstatements concerning blood evidence connecting the defendant

---

[5] The defendant also argues that the judge erred in determining that the seizure was of no consequence because the clothing was returned to the court officer and no observations of the evidence were included in the affidavit of the search warrant.  As we conclude that the motion to suppress was properly denied on the basis of exigent circumstances, we need not address whether the doctrine of inevitable discovery applies.

to the crime, creating a substantial likelihood of a miscarriage of justice. See G. L. c. 278, § 33E. We disagree.

The jury heard from experts regarding three bloodstains on the defendant's sweatshirt. Two of the stains were found to be human blood and were consistent with spatter stains. The remaining bloodstain, too small to analyze further, was consistent with being either a spatter or a transfer stain. An analysis of the deoxyribonucleic acid (DNA) in one of the two larger stains revealed a DNA mixture from at least two people, and that a major profile found in the mixture matched that of the victim. In his closing, the prosecutor argued that all three stains were from the nunchucks used to hit the victim, stating, "[Y]ou also heard about the three spots of spatter on [the defendant's] shirt. . . . [T]hat's probably how those three drops of the victim's blood get there."

The defendant claims that the prosecutor's suggestion that all three stains were spatter and that all three were consistent with the victim's blood were misstatements of the evidence warranting reversal of his convictions. Because the defendant failed to object to the prosecutor's closing argument at trial, our review is limited to determining whether any error produced a substantial likelihood of a miscarriage of justice. Commonwealth v. Mendez, 476 Mass. 512, 521 (2017), citing Commonwealth v. Taylor, 455 Mass. 372, 377 (2009).

"In closing argument, '[p]rosecutors are entitled to marshal the evidence and suggest inferences that the jury may draw from it.'" Commonwealth v. Roy, 464 Mass. 818, 829 (2013), quoting Commonwealth v. Drayton, 386 Mass. 39, 52 (1982). Such inferences need only be reasonable and possible based on the evidence before the jury. Roy, supra. Taylor, 455 Mass. at 383. "Prosecutors may not 'misstate the evidence or refer to facts not in evidence,'" however. Commonwealth v. Martinez, 476 Mass. 186, 200 (2017), quoting Commonwealth v. Kozec, 399 Mass. 514, 516-517 (1987).

Here, expert testimony established that two of the three stains were consistent with spatter, and the third was consistent with either spatter or transfer. This testimony, coupled with the third stain's proximity to the first and second, provided a solid basis for the inference that all three stains were spatter. See Commonwealth v. Cole, 473 Mass. 317, 333 (2015); Roy, 464 Mass. at 829. Similarly, the suggestion that all three stains contained the victim's blood was also a fair inference to draw based on the evidence and the Commonwealth's theory of the case. See Commonwealth v. Valentin, 474 Mass. 301, 308-309 (2016); Commonwealth v. Blaikie, 375 Mass. 601, 612 (1978) ("counsel may argue inferences from the evidence which are most favorable to his or

her theory of the case, as long as the inferences drawn are reasonable").

Also unavailing is the defendant's argument that the prosecutor should have mentioned the DNA mixture in the lone bloodstain that was tested. The defendant's theory was that he was present for the victim's murder but that he was not a participant. The prosecution's theory was that the defendant ordered the killing but did not physically carry it out. Given this basic agreement on the facts, we are not persuaded that mention of the DNA mixture would have had any meaningful exculpatory effect. Whether or not the prosecutor misstated the evidence by omitting this particular fact, the omission was not likely to have influenced the jury's decision, and thus there was not a substantial likelihood of a miscarriage of justice. See Commonwealth v. Wright, 411 Mass. 678, 681 (1992), S.C., 469 Mass. 447 (2014).

3. Ineffective assistance of counsel. In his motion for a new trial, the defendant claims that his trial counsel was ineffective for failing to highlight irregularities in the way investigators handled evidence in order to cast doubt on the chain of custody and, ultimately, on the fact that on the night of the murder the defendant was wearing a blue fleece pullover, which was later found to have human bloodstains.

Because the defendant was convicted of murder in the first degree, rather than reviewing the claim under the traditional Saferian standard,[6] we ask whether there was error resulting in a substantial likelihood of a miscarriage of justice pursuant to G. L. c. 278, § 33E. Wright, 411 Mass. at 681-682. In essence, "[t]he burden is on the defendant to demonstrate that something inappropriate was likely to have unfairly influenced the jury's verdict." Commonwealth v. Barbosa, 477 Mass. 658, 674 (2017), quoting Commonwealth v. Painten, 429 Mass. 536, 550 (1999).

The defendant raises two points based on appellate counsel's inspection of the evidence posttrial. First, the cardboard box that contained Luis's clothing was labeled with his name on both the top flap and the side of the box, but also had the defendant's name on the box with a line through it. Second, according to the investigator's testimony, the defendants' clothing was placed into five separately labeled plastic bags at the police station prior to being put into evidence boxes. However, appellate counsel found two additional unlabeled plastic bags with the trial evidence that were not referenced during the trial.

---

[6] Under Commonwealth v. Saferian, 366 Mass. 89, 96 (1974), the traditional standard for ineffective assistance of counsel is whether an attorney's performance fell measurably below that which might be expected from an ordinary fallible lawyer and, if so, whether such ineffectiveness has likely deprived the defendant of an otherwise available substantial defense.

The defendant asserts that trial counsel's failure to direct the jury's attention to these discrepancies may have made a difference in the jury's verdicts. We disagree. Counsel for both Ismael and the defendant vigorously challenged the chain of custody of the clothing generally. The defendant's trial counsel focused on the fleece pullover in particular, pointing out that there was no record of what the defendant wore when he was arrested, and that the defendant's booking photograph depicted him in a white T-shirt. Finally, defense counsel established during cross-examination that the clothing seized from the defendant by an investigator was given to a court officer in unlabeled evidence bags when the investigator was ordered to stop the seizure.

The defendant has made no showing that the discrete issues he raised in support of his motion for a new trial would have made a difference in the jury's verdicts, especially because he has made no connection between the discrepancies and the fleece pullover. More importantly, although the blood evidence on the fleece pullover was part of the Commonwealth's case, the defendant was alleged to have ordered the killing, and not to have committed the murder himself. Thus, the blood evidence was merely additional circumstantial evidence showing that the defendant was present during the murder.

4. <u>Review under G. L. c. 278, § 33E</u>. In addition to a review of the prosecutor's closing argument, we have reviewed the entire record and discern no reason to reduce the degree of guilt or grant a new trial pursuant to our powers under G. L. c. 278, § 33E.

<u>Conclusion</u>. We affirm the defendant's convictions and the order denying the defendant's motions for a new trial and for posttrial discovery.

<u>So ordered</u>.