KAFKER, J.
**312 Andrew Stanley was shot and killed in his home in Hyannis while his hands and feet were bound by handcuffs, zip ties, and duct tape. The ensuing police investigation resulted in the arrests of four coventurers, including the defendant, Eddie Mack. A jury convicted the defendant of murder in the first degree on the theories of felony-murder and extreme atrocity or cruelty.[1] ,[2] The defendant appeals from his convictions, arguing that he is entitled to a new trial for several reasons. Specifically, he argues that a new trial is warranted because (i) the publicity surrounding his case deprived him of his right to a fair trial; (ii) fingerprint evidence was admitted in error for want of proper authentication; (iii) evidence from a coventurer's cell phone was admitted in error; (iv) his defense counsel was constitutionally ineffective for failing to move to suppress evidence obtained *524 from searches of two cell phones; and (v) the prosecutor made two statements unsupported by the evidence during closing argument. The defendant also alleges numerous other errors in a separate brief that he contends is filed in accordance with Commonwealth v. Moffett, 383 Mass. 201, 418 N.E.2d 585 (1981). Finally, he argues that we should exercise our authority under G. L. c. 278, § 33E, to grant him a new trial or to reduce or set aside the verdict of murder in the first degree.
For the reasons set forth below, we affirm the defendant's convictions and decline to grant extraordinary relief pursuant to G. L. c. 278, § 33E.
Background. The facts that the jury could have found in this case were set forth in detail in Commonwealth v. Webster, 480 Mass. 161, 162-164, 102 N.E.3d 381 (2018). We summarize many of them once **313 again here, reserving certain details for discussion of specific issues.
At approximately 1:20 P.M. on July 11, 2012, police responded to reports of shots fired at a home in Hyannis. Upon arrival, police officers heard moaning and yelling coming from the home. After one officer saw an individual he recognized as Keiko Thomas looking out a window of the home, the officers heard gunfire. Three men were then seen fleeing from the home and jumping over an adjacent fence. An officer recognized one of the fleeing men as the defendant. Officers pursued the men on foot and apprehended Thomas and another individual, David Evans. The fourth coventurer, Steven Webster, was not apprehended until several months later.
With the aid of a canine unit, the police eventually tracked down and apprehended the defendant, who was hiding behind an air conditioning unit outside a nearby liquor store. Police recovered several items near the area where the defendant had been hiding, including a large amount of marijuana inside the air conditioning unit and a large amount of cash and several cell phones underneath a pallet next to the unit. Two of the cell phones were later determined to belong to the defendant and the victim, respectively. Following his apprehension, the defendant was taken back to the crime scene and was identified by a witness as one of the men whom the witness saw fleeing the victim's home following the shooting.[3]
Inside the home, police found the victim lying unresponsive on the floor. His hands and feet were bound with handcuffs, duct tape, and zip ties. He had numerous abrasions, injuries from blunt force trauma, and marks on his body consistent with the use of a stun gun. The cause of death was a single gunshot wound to the torso. In the parking lot next to the home, police located a backpack containing the following: two firearms, one of which was a loaded .45 caliber Colt handgun; gloves; a roll of duct tape consistent with the duct tape used to bind the victim; a stun gun; an aerosol can; zip ties; and a black face mask, which had Webster's deoxyribonucleic acid (DNA) on it.[4] A spent shell casing found at the scene was later determined to have been fired **314 from the Colt handgun. The bullet retrieved from the victim's body was consistent with having come from that type of firearm.
Through the course of their investigation, investigators recovered forensic evidence tying each of the coventurers to the *525 crime scene.[5] For example, investigators found a piece of duct tape containing the defendant's fingerprint at the scene, and his palm print was located on the lower part of a window of the home. Footwear impressions from a chair cushion and the kitchen and driveway of the home also were determined to be consistent with the type of popular shoe that the defendant was wearing at the time of his apprehension. Additionally, tire impressions found in the dirt and gravel of the backyard of the home were consistent with the pattern made by the tires of a Chevrolet Impala vehicle that Evans had rented a few days prior to the killing. Webster's DNA was located on the interior and exterior handles of the rear passenger's side door of the vehicle. Finally, cell site location information evidence placed the cell phones belonging to Webster, Evans, and the defendant in the Barnstable area on the day of the killing.
Investigators also used cell phone records to establish that the coventurers were in frequent communication with each other via calls and text messages prior to and on the day of the killing. Specifically, these records showed that from July 1 to July 11, Webster called or sent text messages to numbers associated with Evans numerous times. On July 3, Webster sent a text message to Evans that stated, "Got some heat lined up," and "Bring dem rollie up, in the arm rest." On July 7, Webster sent another text message to Evans, stating, "I am to go snatch my lil heat by Norfolk and cum bak." On July 8, the defendant sent a text message to Evans saying, "Gotta come down so I can explain it better bro so we can get better understandin feel me." On July 9, Evans sent a text message to Webster asking, "So, what about mack?" Webster responded, "We out their what time was u tryna head out their?" Evans replied, "We gotta see dude at nine tho." The day before the killing, the defendant sent another text message to Evans asking, "Yal good?" Evans responded, "Yup. We out there tomorrow night cuz." On the day of the killing, the defendant sent a text message to Evans approximately one hour **315 before the police responded to the victim's home, asking, "Yal ready?" Evans responded, "Waiting on u." Mack responded one minute later, saying, "We at table ... Com On." Following the shooting, at 2:21 P.M. , Webster -- the only coventurer who had yet to be apprehended by that point -- telephoned the defendant, using a calling feature to block the caller's identification.
The jury eventually returned guilty verdicts on all five charges, and the defendant was subsequently sentenced to life in prison without the possibility of parole. The defendant now appeals.
Discussion. The defendant argues that he is entitled to a new trial for the reasons identified supra. We address each argument in turn.
1. Right to a fair trial. The defendant argues first that the publicity surrounding his case deprived him of his constitutional right to a fair trial guaranteed by the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. His principal contention is that the trial judge improperly seated seven jurors on the first day of jury empanelment without having inquired of them whether they had been exposed to media coverage of the case and, if so, whether such exposure had led them to form a bias against the defendant.
*526 The Sixth Amendment and art. 12 guarantee the right of a criminal defendant to a trial by an impartial jury. Commonwealth v. Toolan, 460 Mass. 452, 462, 951 N.E.2d 903 (2011). See Skilling v. United States, 561 U.S. 358, 377, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010). Determining whether extensive pretrial publicity violates this right requires a two-step analysis. First, we examine "whether a change of venue was required because the jury were presumptively prejudiced against him." Toolan, supra. If it is determined that the jury were not presumptively prejudiced, "we next examine whether the defendant has shown actual juror prejudice." Id. The defendant does not allege, and the record does not reveal, that the jury were presumptively prejudiced against him in this case.[6] Accordingly, we consider only whether he has shown actual juror prejudice.
**316 In assessing the existence of actual juror prejudice, we consider whether, "in the totality of the circumstances, pretrial publicity deprived [the defendant] of his right to a fair and impartial jury." Commonwealth v. Hoose, 467 Mass. 395, 408, 5 N.E.3d 843 (2014). See Toolan, 460 Mass. at 466, 951 N.E.2d 903. Where pretrial publicity renders the risk of juror bias "particularly acute" or "especially significant," both this court and the United States Supreme Court have emphasized the need for an adequate voir dire. Toolan, supra at 466-467, 951 N.E.2d 903. See Skilling, 561 U.S. at 384-385, 130 S.Ct. 2896. The defendant argues that the trial judge's failure to conduct an individual voir dire of each of the seven jurors seated on the first day of jury empanelment regarding any potential media exposure resulted in actual prejudice. We disagree.
Before individual voir dire of potential jurors regarding exposure to pretrial publicity is warranted, there must be some showing that the allegedly biased jurors may have been exposed to said publicity. See Skilling, 561 U.S. at 384, 130 S.Ct. 2896 (voir dire warranted where case had "widespread community impact"); Toolan, 460 Mass. at 466-467, 951 N.E.2d 903 (voir dire warranted where risk of juror bias from extensive pretrial publicity was "especially significant"). See also Hoose, 467 Mass. at 408-409, 5 N.E.3d 843 (no evidence that all seated jurors were prejudiced by pretrial publicity, as "only two seated jurors had been exposed to any pretrial publicity at all, and both were subjected to a thorough individual voir dire"). On the record before us, there is no evidence that any of the seven jurors seated on the first day of jury empanelment may have been exposed to any pretrial publicity. Indeed, the only evidence of any media coverage of the case comes in the form of several news articles published at various points during the trial.[7] The first of *527 these articles, however, was published on the second day of jury empanelment -- after the seven jurors at issue had already been seated. These jurors therefore could not have been exposed to this **317 article prior to being seated. Moreover, once the media began to cover the trial, the trial judge took ample steps to guard against any prejudice stemming from the media coverage. For example, after witnessing a journalist in the court room on the first day of jury empanelment, the judge instructed the seven seated jurors to avoid any media coverage of the case and to inform the court officer and the court if they did, in fact, become so exposed. Additionally, the judge conducted an individual voir dire of each of the remaining potential jurors regarding their exposure to any media coverage. Finally, the judge repeatedly instructed the seated jurors throughout trial that they were required to avoid any and all media coverage of the case and that they must inform the court if they did come across any coverage. Accordingly, in light of the lack of evidence that the seven seated jurors had been exposed to pretrial publicity, as well as the "steps taken by the trial judge to safeguard the defendant's right to an impartial jury," Hoose, supra at 409, 5 N.E.3d 843, we conclude that the defendant has failed to show actual juror prejudice by way of pretrial publicity.[8] Cf. id. at 408-409, 5 N.E.3d 843 (no actual prejudice where judge allowed counsel to question individual jurors, "admonished potential and seated jurors not to discuss the case with anyone under any circumstances and not to come into contact with any local news accounts related to the case," and "inquired each time potential or seated jurors returned to court whether anyone had come into contact with any information related to the case and noted their responses for the record"). Contrast Toolan, supra at 468, 951 N.E.2d 903 (actual juror prejudice shown where pretrial publicity was "extensive," where publicity was "prejudicial to the defendant's anticipated theory of defense," **318 and where "many prospective jurors knew the victim, her family, or witnesses, [and] the influence of mass media coverage overlapped with, and was reinforced by, informal interactions and conversations").
2. Admission of fingerprint evidence. At trial, the Commonwealth introduced, over the defendant's objection, a piece of duct tape recovered at the crime scene through the testimony of State police Trooper Michael Lombard. The duct *528 tape itself, however, was initially discovered by Barnstable police Officer Mark Mellyn after he stepped on it as he entered the victim's home. Mellyn testified that after he noticed that he had stepped on the duct tape, he carefully removed it from his shoe with gloves and placed it a few feet from the victim's body. Mellyn then identified the duct tape that he had stepped on in a photograph at trial. The duct tape in the photograph was next to a yellow placard labeled no. fifteen (placard fifteen). The duct tape was thereafter collected by Lombard, who testified that he collected the duct tape that was on the floor next to placard fifteen. Subsequent forensic testing of this duct tape revealed that it contained the defendant's fingerprint.
On appeal, the defendant argues that this evidence was admitted without having been properly authenticated. The defendant argues that the duct tape could have only been properly authenticated through the testimony of Mellyn, not Lombard. We discern no error.
To properly authenticate evidence, the proponent of the evidence must make a showing "sufficient to support a finding that the item is what the proponent claims it is.' " Commonwealth v. Woollam, 478 Mass. 493, 498, 87 N.E.3d 64 (2017), cert. denied, --- U.S. ----, 138 S.Ct. 1579, 200 L.Ed.2d 766 (2018), quoting Mass. G. Evid. § 901(a) (2017). See Commonwealth v. Purdy, 459 Mass. 442, 447, 945 N.E.2d 372 (2011), quoting M.S. Brodin & M. Avery, Massachusetts Evidence § 9.2, at 580 (8th ed. 2007) ("The role of the trial judge in jury cases is to determine whether there is evidence sufficient, if believed, to convince the jury by a preponderance of the evidence that the item in question is what the proponent claims it to be. If so, the evidence should be admitted, if it is otherwise admissible"). Here, we are satisfied that there was sufficient evidence to authenticate the duct tape introduced through Lombard. Mellyn testified that the duct tape he stepped on was the duct tape photographed next to placard fifteen at the crime scene. Lombard then testified that the piece of duct tape he collected -- and which subsequent testing revealed **319 to contain the defendant's fingerprint -- was located next to placard fifteen. The judge did not abuse his discretion in concluding that this testimony sufficed to authenticate the duct tape and establish its chain of custody.[9] See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27, 20 N.E.3d 930 (2014) (abuse of discretion exists only where "judge made a clear error of judgment in weighing the factors relevant to the decision, such that the decision falls outside the range of reasonable alternatives" [quotation and citation omitted] ).
3. Admission of coventurer's cell phone records. The defendant also challenges the admission of evidence connecting a specific cell phone number with one of the coventurers, Evans, arguing that the Commonwealth failed to properly authenticate the cell phone number as belonging to Evans. We considered and rejected this exact argument in *529 Webster, 480 Mass. at 170-171, 102 N.E.3d 381. We decline to revisit it here.[10]
4. Ineffective assistance of counsel. The defendant next argues that his trial counsel was constitutionally ineffective for failing to move to suppress records obtained from searches of the defendant's cell phone and Evans's cell phone. He argues that defense counsel should have moved to suppress these records because the affidavits in support of the search warrants for these cell phones failed to establish probable cause. To prevail on a claim of ineffective assistance of counsel due to a failure to move to suppress evidence in cases of murder in the first degree, the defendant must demonstrate both that the motion would have been successful and that counsel's failure to make the motion created a substantial likelihood of a miscarriage of justice. Commonwealth v. Cruzado, 480 Mass. 275, 282, 103 N.E.3d 732 (2018). See Commonwealth v. Williams, 453 Mass. 203, 207, 900 N.E.2d 871 (2009). Because we conclude that any motion to suppress these records would have **320 failed, the defendant's trial counsel was not constitutionally ineffective.
For a search of the contents of a cell phone to be reasonable under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, the affidavit in support of the search warrant must establish probable cause to believe (i) that a "particularly described offense has been, is being, or is about to be committed"; and (ii) that the cell phone's contents "will produce evidence of such offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit such offense" (citation omitted). Commonwealth v. Fulgiam, 477 Mass. 20, 33, 73 N.E.3d 798, cert. denied, --- U.S. ----, 138 S.Ct. 330, 199 L.Ed.2d 221 (2017). When considering whether an affidavit has met these two requirements, our review "begins and ends with the four corners of the affidavit" (citation omitted). Commonwealth v. Dorelas, 473 Mass. 496, 500-501, 43 N.E.3d 306 (2016). "All reasonable inferences which may be drawn from the information in the affidavit may also be considered as to whether probable cause has been established" (quotations omitted). Commonwealth v. Holley, 478 Mass. 508, 522, 87 N.E.3d 77 (2017). Whether probable cause exists to believe that a cell phone contains evidence of a crime "is a fact-intensive inquiry and must be resolved based on the particular facts of each case." Commonwealth v. Morin, 478 Mass. 415, 426, 85 N.E.3d 949 (2017).
a. Search of the defendant's cell phone. The affidavit in support of the search warrant for the defendant's cell phone satisfied both requirements. See Fulgiam, 477 Mass. at 33, 73 N.E.3d 798. As to the first requirement, the affidavit clearly established probable cause to believe that a particularly described offense had been committed. The affidavit described that police responded to the scene of a shooting and found an individual suffering from a gunshot wound lying face down on the floor with his hands bound. The affidavit further stated that this individual subsequently died.
As to the second requirement, the affidavit demonstrated probable cause to believe that the contents of the defendant's cell phone would produce evidence of the offense. The affidavit described that while being interrogated by police, one of the *530 coventurers, Thomas, stated that the defendant had telephoned Thomas on the day of the killing and told Thomas that he was at the victim's home to make a drug deal. The affidavit further described that once police responded to a report of gunshots at the victim's home, the defendant, Thomas, and Evans were each seen **321 fleeing from the crime scene. Finally, the affidavit stated that at the time the defendant was apprehended, he was hiding behind a local liquor store and had attempted to conceal four cell phones in his immediate vicinity. These facts, along with the reasonable inferences drawn therefrom, established that the defendant was at the home of the victim close in time to the killing; that the defendant used his cell phone to communicate with a coventurer in advance of the killing; that the shooting was likely connected to the drug deal that had taken place between the defendant and the victim that day; and that upon fleeing the crime scene once police arrived, the defendant felt it necessary to flee with and attempt to conceal several different cell phones, inferably because they contained content implicating his involvement in the crimes. Cf. Holley, 478 Mass. at 526, 87 N.E.3d 77 (inference that suspects took victim's cell phone because it contained inculpatory evidence reasonable). It was therefore reasonable to infer that the defendant's cell phone communications were instrumental in the commission of the crimes. Accordingly, the affidavit established probable cause to believe that the defendant's cell phone would contain evidence of the killing. Cf. Cruzado, 480 Mass. at 282, 103 N.E.3d 732 (probable cause to search cell phone where cell phone found next to defendant at time of apprehension, defendant and victim had been together on day of murder, and third party had overheard defendant confessing to crime on cell phone); Holley, supra at 522-524, 87 N.E.3d 77 (probable cause to search cell phone where affidavit established that defendant called victim shortly before murder and shooting was likely connected to drug deal, even though "affidavit did not state specifically that [the defendant] was sending text messages"). Contrast Morin, 478 Mass. at 427, 85 N.E.3d 949 (no probable cause to search cell phone where affidavit stated that codefendant had called defendant before and after homicide, but did not otherwise implicate defendant in crime).
b. Search of Evans's cell phone. The defendant does not argue that the affidavit failed to establish probable cause to search Evans's cell phone. Rather, he argues that because the affidavit in support of the search warrant for Evans's cell phone relied on information police obtained from searching the defendant's cell phone, the evidence from Evans's cell phone is properly considered the fruit of the illegal search of the defendant's cell phone. As we have concluded that the search of the defendant's cell **322 phone was lawful, this argument fails.[11]
5. Prosecutor's closing argument. Finally, the defendant argues that the prosecutor made statements in closing argument that were not supported by the evidence, and that these statements amounted to reversible error. Because the defendant did not object to these statements at trial, we review any error to *531 determine whether it produced a substantial likelihood of a miscarriage of justice. Commonwealth v. Parker, 481 Mass. 69, 74, 112 N.E.3d 257 (2018).
The defendant challenges two specific statements made during closing argument. First, the defendant argues that the prosecutor erroneously stated that Evans's "street name" was "Trigger" and then improperly suggested that the jury could reasonably infer that "TR" -- a contact name stored in the defendant's cell phone -- referred to "Trigger," i.e., Evans. Second, the defendant argues that the prosecutor erred when he defined the abbreviation "W.g." contained in a text message between the defendant and Evans to mean "We good." The defendant argues that these statements amounted to reversible error because they were not supported by the evidence and improperly allowed the jury to infer the existence of a "joint venture by authenticating evidence that could not otherwise be authenticated and by translating text messages supporting this conclusion."
It is well established that during closing argument, a prosecutor "may not misstate the evidence or refer to facts not in evidence" (quotation and citation omitted). Parker, 481 Mass. at 74, 112 N.E.3d 257. A prosecutor is, however, "entitled to marshal the evidence and suggest inferences that the jury may draw from it" (citation omitted). Commonwealth v. Roy, 464 Mass. 818, 829, 985 N.E.2d 1164 (2013). Any suggested inferences "need only be reasonable and possible based on the evidence before the jury." Parker, supra. Statements made during closing argument are to be reviewed "in the context of the entire closing, the jury instructions, and the evidence introduced at trial." Commonwealth v. Martinez, 476 Mass. 186, 198, 65 N.E.3d 1185 (2017). We address the propriety of each statement separately.
a. Link between "TR" and "Trigger." The jury received evidence from which they could infer that Evans's street name was **323 "Trigger." See Webster, 480 Mass. at 170-171, 102 N.E.3d 381. There was also evidence that a contact in the defendant's cell phone was labeled "TR." During closing argument, the prosecutor stated, "I suggest to you that it's a reasonable inference for you to draw that TR with that phone number would be Evans's phone number."[12] Notably, the prosecutor did not argue that "TR" was undoubtedly a reference to "Trigger" or suggest that the link between the two names was a fact in evidence. Rather, he stated only that such a link was a "reasonable inference for [the jury] to draw." This suggestion was not an error. Indeed, as we noted supra, prosecutors are permitted to suggest inferences that the jury may draw from the evidence that was put before them. Roy, 464 Mass. at 829, 985 N.E.2d 1164. Moreover, these inferences "need only be reasonable and possible." Parker, 481 Mass. at 74, 112 N.E.3d 257. In the context of the entire argument and the evidence before the jury, it was not an impermissible inference that the abbreviation "TR" referred to Evans's street name "Trigger." Accordingly, the prosecutor's statement did not constitute error.
b. Suggestion that "W.g." means "We good." Later on in his closing argument, the prosecutor began to describe several text messages between the *532 defendant and Evans. In one message, Evans responded to a question posed by the defendant with "W.g." In his closing, the prosecutor stated outright that this abbreviation stood for "We good." The record does not appear to contain a basis from which the jury could reasonably infer that the abbreviation "W.g." in this text message meant "We good." The prosecutor's statement therefore amounted to speculation, rather than a suggestion of a reasonable inference. Accordingly, this statement was an error. The error did not, however, create a substantial likelihood of a miscarriage of justice because it was not likely to have influenced the jury's conclusion. Commonwealth v. Copeland, 481 Mass. 255, 264, 114 N.E.3d 569 (2019) (prosecutor's closing argument creates substantial likelihood of miscarriage of justice only where error is likely to have influenced jury's conclusion). The defendant argues that he was prejudiced by this statement because it enabled the prosecutor to "prove to the jury the existence of joint venture by ... deciphering initials to support[ **324 the] prosecutor's theory of the case." This argument is unavailing, as the evidence of joint venture independent of this statement was overwhelming. Indeed, three of the coventurers, including the defendant, were seen leaving the victim's home and fleeing the crime scene; the defendant and two other coventurers were arrested near the scene; multiple cell phones, rolls of duct tape, zip ties, and firearms were recovered near the scene; multiple cell phones and large amounts of cash and marijuana were found near the defendant at the time of his apprehension; and a vehicle rented under Evans's name and containing Webster's DNA left tire prints at the scene. Additionally, telephone call records indicated that the coventurers were in close communication prior to the killing. Accordingly, the meaning of "W.g." in one text message was of little significance to the question of the existence of a joint venture, and certainly was unlikely to have swayed the jury.
6. Defendant's Moffett claims. The defendant, in what he characterizes as a brief filed pursuant to Moffett, 383 Mass. 201, 418 N.E.2d 585, asserts numerous additional allegations of trial errors and claims of ineffective assistance of counsel. We conclude that all of these arguments are without merit.
7. Review pursuant to G. L. c. 278, § 33E. Finally, after a thorough review of the record, we find no reason to exercise our authority under G. L. c. 278, § 33E, to grant a new trial or to either reduce or set aside the verdict of murder in the first degree.
Conclusion. For the foregoing reasons, we affirm the defendant's convictions.
So ordered.

The defendant was also convicted of home invasion, G. L. c. 265 § 18C ; armed assault in a dwelling, G. L. c. 265 § 18A ; and carrying a firearm without a license, G. L. c. 269 § 10 (a ). The judge dismissed an armed robbery conviction, which was the predicate offense for felony-murder, contingent on the murder conviction being upheld.

The defendant was tried with Steven Webster, who was convicted of, among other offenses, murder in the first degree on the theory of felony-murder. We considered Webster's appeal separately and affirmed his convictions. See Commonwealth v. Webster, 480 Mass. 161, 171-172, 102 N.E.3d 381 (2018). Two other coventurers, Keiko Thomas and David Evans, pleaded guilty to several offenses, including manslaughter. Id. at 162 n.2, 102 N.E.3d 381.

Specifically, the witness identified the defendant as "the kid that fell off of the fence" and "the first one that came out of the house ... and then jumped over."

The defendant's deoxyribonucleic acid was not found at the scene or on any of these items.

Additionally, as described supra, a police officer recognized both the defendant and Thomas as they fled the victim's home following the shooting. The defendant was also positively identified by a witness who saw the defendant flee the home.

Presumptive prejudice may be found where "the entire jury pool is tainted by exposure to pretrial publicity." Commonwealth v. Toolan, 460 Mass. 452, 463, 951 N.E.2d 903 (2011). This presumption only arises, however, "in truly extraordinary circumstances." Id. Indeed, "[p]retrial publicity -- even pervasive, adverse publicity -- does not inevitably lead to an unfair trial." Id., quoting Skilling v. United States, 561 U.S. 358, 384, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010). Even if the defendant had raised this argument, as explained infra, the record before us does not reveal that the media coverage of this case tainted the jury pool against him. See Commonwealth v. Morales, 440 Mass. 536, 540, 800 N.E.2d 683 (2003) ("the publicity must be both extensive and sensational" [citation omitted] ).

The defendant also points to the fact that media members had twice sought leave of the court to cover pretrial proceedings. Although the record reveals this to be true, the most recent attempt was over twelve months before trial. The defendant does not explain how the presence of media members at a pretrial proceeding over one year before trial prejudiced the jurors seated on the first day of juror empanelment. See Commonwealth v. Entwistle, 463 Mass. 205, 222, 973 N.E.2d 115 (2012), cert. denied, 568 U.S. 1129, 133 S.Ct. 945, 184 L.Ed.2d 736 (2013) (lapse of time between media coverage and jury empanelment factor when considering existence of juror prejudice).

The lack of any meaningful pretrial publicity is also reflected by defense counsel's failure to request individual voir dire on this issue on the first day of jury empanelment. Indeed, defense counsel had a full and fair opportunity to ask each of the seven jurors seated on the first day if they had been exposed to any media coverage -- but he did not. Instead, he stated that he was either "content" or "satisfied" with each of the seven seated jurors. Defense counsel even went on to note on the fourth day of jury empanelment that he had not "see[n] anything extraordinary" with regard to the media coverage of the defendant's case.
Moreover, each of the jurors seated on the first day of jury empanelment were individually asked if they could be "fair and impartial, listen to [the judge's] instructions, and decide this case on the evidence that's presented." Each responded affirmatively. Further, none of the seven jurors seated on the first day raised his or her hand when the entire venire was asked whether they had "formed or expressed any opinion with regard to this case," or whether they were "aware of any bias or prejudice of any kind with regard to this case."

To the extent that there were any concerns about the chain of custody of the duct tape, the trial judge allowed defense counsel to cross-examine each relevant witness as to the chain of custody of the duct tape and permitted defense counsel to argue its authenticity during closing argument. The alleged defects in the chain of custody thus went to the weight of the evidence, not its admissibility, as was appropriate. Commonwealth v. Viriyahiranpaiboon, 412 Mass. 224, 230, 588 N.E.2d 643 (1992). Cf. Commonwealth v. Diaz, 478 Mass. 481, 492, 86 N.E.3d 485 (2017) (no error in admitting testimony regarding mishandled evidence where judge allowed defendant to argue defective chain of custody).

Specifically, we concluded that "the confirming circumstances that the Commonwealth presented were sufficient to meet its burden and that the judge properly admitted the evidence." Webster, 480 Mass. at 170, 102 N.E.3d 381.

Because we conclude that the search of the defendant's cell phone was lawful, we do not address the Commonwealth's argument that the defendant lacks standing to contest the search of Evans's cell phone.
Additionally, because we conclude that the cell phone evidence was properly admitted, we do not address the defendant's argument that had this evidence been suppressed, he would have been entitled to a required finding of not guilty.

The defendant also argues that this statement was improper because the Commonwealth did not properly authenticate the telephone number associated with Evans as belonging to Evans. As discussed supra, we have already concluded that ample evidence authenticated Evans's telephone number. Webster, 480 Mass. at 170-171, 102 N.E.3d 381.