NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-213

COMMONWEALTH

vs.

GERALD BOWENS.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

At around nine o'clock in the evening on September 18, 2019, the defendant, Gerald Bowens, and the victim, Timothy Walton, were "mingling" on a street corner close to the Boston Medical Center (BMC).  According to the defendant, he was smoking marijuana, and the two had an argument when he refused to share it.  The altercation escalated when Walton pulled out a knife and cut the defendant over his left ear.  The defendant then stabbed Walton multiple times and left him bleeding on the sidewalk.  Walton died of his injuries, and the defendant was indicted for manslaughter.  Thereafter, the defendant was

convicted following a trial at which he testified and claimed that he acted in self-defense.[1]

The entire fight was captured by security surveillance cameras. Video footage taken from those cameras was admitted in evidence, in part over the defendant's objection. On appeal, the defendant contends that the judge abused his discretion in admitting portions of the footage that depicted Walton bleeding heavily and lying unconscious on the sidewalk while first responders attempted to revive him. The defendant argues that this footage had no probative value, was inflammatory, and was unduly prejudicial. The defendant also contends that the prosecutor impermissibly suggested in her closing argument that he had a motive other than to defend himself when he stabbed Walton. Although there is no dispute that the video footage at issue is graphic, we conclude that it had some probative value to disprove the defendant's claim of self-defense; and that the precautionary measures taken by the judge, which included excusing all prospective jurors who said they would have difficulty viewing graphic images, limiting the jury's exposure to that evidence during trial, and instructing the jury that they were not to be influenced by the graphic nature of the

---

[1] This was the defendant's second trial. The jury in the first trial were unable to reach a verdict, and the judge, who also presided over the second trial, declared a mistrial.

video evidence, sufficiently mitigated the risk of unfair prejudice.  In addition, we are not persuaded that the prosecutor's closing argument, to which there was no objection, strayed beyond permissible bounds.  Accordingly, we affirm the judgment of conviction.

Background.  The jury could have found the following facts. Kerry Jo Green was walking down Massachusetts Avenue away from the BMC toward the corner of Albany Street when she saw two men, later identified as the defendant and Walton, fighting.  After the defendant left the scene, Green immediately walked over to Walton and saw that he was bleeding from a wound in his upper left leg.  She placed one hand on the wound and called 911. Within minutes, members of the Boston fire department, Boston emergency medical services, BMC's public safety department, and the Boston police department arrived.  At this point, Walton was unconscious and in cardiac arrest.  Cardiopulmonary resuscitation (CPR) performed at the scene was unsuccessful, and Walton was pronounced dead when he arrived by ambulance to the BMC's emergency department.

As explained by the medical examiner who conducted the autopsy, Walton had four stab wounds:  two on his upper left arm; one to his chest, which punctured his left lung and prevented him from breathing properly; and one to his left leg,

3

which nicked his femoral artery and caused him to lose enormous amounts of blood.

About one hour after the stabbing, the defendant sought treatment for the cut on his head at Carney Hospital located a few miles away from the BMC in Dorchester. At that time, he reported that he fell down some stairs and hit his head against a wall. The treating physician described the cut as a "simple laceration."[2] The defendant remained at the hospital for about thirty minutes while his wound was cleaned and closed with two staples. Three days later, the defendant was arrested at a bus stop close to the scene of the stabbing after a BMC public safety officer recognized him as a person of interest.

During the course of the investigation, Boston police detectives obtained video footage from various surveillance cameras located within the vicinity of the stabbing. The video footage was admitted in evidence as four separate exhibits, each consisting of one digital video disc that we have reviewed. Two of the exhibits, numbers 1 and 35, are composites drawn from raw footage. The other two exhibits, numbers 37 and 45, contain the raw footage from which exhibits 1 and 35 were created.

---

[2] The treating physician explained that a "simple laceration" is a laceration that "doesn't penetrate any of the deeper tissues, . . . a simple scalp laceration would just be the very outer layers of skin and fat basically."

4

Exhibit 1 is about eight minutes long and shows the entire sequence of events from the beginning of the fight up to the time when Walton is removed from the scene by paramedics. The jury were shown the first six minutes and twenty-two seconds of the video recording. That footage shows Walton stabbing the defendant first, cutting him in the head. The defendant then takes out a knife and stabs Walton. As the fight moves onto the street, Walton tries to kick the defendant, who then stabs Walton in the leg. The video footage then shows blood spurting from the wound and Walton stumbling backward onto the sidewalk while the defendant continues to stab him. Occasionally the defendant's strikes miss Walton, and the knife hits the pavement. As seen on the video footage, the force of the defendant's blows is strong enough to cause sparks to fly when his knife strikes the ground. The fight continues while Walton is on the ground, and at one point when Walton attempts to crawl away, the defendant gets on top of him and holds him down for about forty seconds. The defendant then gets up and departs on a bicycle. Walton, bleeding heavily, stands up and walks a few steps before collapsing. At this point, Green arrives and calls 911. The video footage then shows Green and another unidentified woman assisting Walton until the police and emergency medical technicians arrive about a minute later. The

5

last three minutes of the video footage shows Walton on the ground as firefighters and paramedics treat him and perform CPR. As noted, the jury were shown about a minute of this part of the video footage in the court room. The remaining two minutes of the video footage, during which paramedics continue to perform CPR and Walton is placed on a stretcher, was not shown to the jury in the court room, but the entire video recording was available to them during deliberations.

Exhibit number 35 is about two minutes long and begins just before Walton is stabbed in the leg and ends before the first BMC public safety officer arrives. Most of this video recording was played for the jury.[3] The jury were shown footage of only the stabbing from exhibits 37 and 45.

The defendant presented a robust defense. He testified at trial and explained that he knew Walton, whom he called by his nickname "Strap," for less than a year before the stabbing. Although the two occasionally smoked marijuana together, there was friction between them, and the defendant attempted to portray Walton as an aggressive person who once offered to sell him a firearm and who had recently beat a person with a wooden bat. In addition, the defendant testified that on the day

_____

[3] The jury were shown all but the last twenty-two seconds of exhibit 35.

6

before the stabbing, Walton challenged him to a fight over a disagreement he had with the defendant's girlfriend.

The defendant said that, on the evening in question, he was smoking a "marijuana blunt" when Walton approached him and asked for a "hit." The defendant replied that he was "smoking by [him]self" after which Walton pulled out a knife and stabbed him in the head. The defendant, who was armed with a knife, admitted that he then stabbed Walton, but claimed he did so in self-defense. The defendant denied that he stabbed Walton once Walton fell to the ground. On cross-examination, the defendant admitted that he spent about ten hours a day selling marijuana and "crack" cocaine on Massachusetts Avenue and acknowledged that the area was a "dangerous" one where he carried a knife for protection.

Three additional witnesses testified for the defendant. A nurse who reviewed his medical records from Carney Hospital opined that the defendant had sustained a serious head injury, and a clinical and forensic psychologist described a person's psychological and physiological reaction to danger known as the "[f]ight and/or flight" response. In addition, the defendant's cousin, who claimed to have witnessed Walton challenge the defendant to a fight in front of his girlfriend the day before, also testified.

Discussion. 1. Graphic video footage. The video recording evidence at issue was the subject of motions in limine filed by the defendant and the Commonwealth prior to the first trial.[4] As articulated in his motion, the defendant sought to exclude all portions of the video recordings that showed what occurred after he left the scene. He asserted that footage depicting Walton "bleeding out on the sidewalk from the severed femoral artery and EMT's unsuccessful efforts to save his life" lacked probative value and was unnecessarily gruesome and prejudicial. The Commonwealth, while acknowledging that portions of the video footage were gruesome, sought to introduce all the footage claiming that it was relevant to show the entire sequence of events, Walton's injuries, and to prove that the defendant did not properly act in self-defense. At that time, the judge denied the defendant's motion and allowed the Commonwealth's motion.

The parties renewed their motions in limine at the start of the second trial.[5] After hearing argument, the judge reviewed both the video recording evidence and his prior ruling, before

_____

[4] The defendant also moved to exclude certain autopsy photographs, but the admission of these photographs is not an issue on appeal.

[5] It bears noting that the same prosecutor and defense counsel from the first trial represented the Commonwealth and the defendant in the second trial.

again concluding that all the footage was admissible.  The judge

reasoned that the video recording evidence was "highly relevant

to show the sequence of timing and events," "the extent of the

[victim]'s injuries," and "the element that the defendant caused

the death."[6]  However, recognizing the heightened risk of

prejudice from showing graphic images to the jury, the judge

took a number of precautionary measures.

First, he instructed the Commonwealth to "use [challenged]

portion[s] of the video[s] in ways that minimize any prejudice,"

including not showing the video footage in "slow motion" or

---

[6] The judge ruled from the bench as follows:

"While we are waiting for the jury I am going to, as I did
at the first trial, allow the Commonwealth to play the
entire video.  But consistent with this approach at the
last trial, I want the Commonwealth to use it in a way that
avoids any unfair prejudice, so let me just read my ruling.
And let me just preface this by saying I watched the video
again and it's graphic, there is a lot of blood on the
ground after Mr. Bowens leaves.  So to put this on the
record, the defense motion to exclude that portion of the
video is denied under the Commonwealth v. Walters and I
[c]ite the case and other applicable case law.  The entire
video is highly relevant to show the sequence and timing of
events.  The extent of the decedent's injuries and the
element that the defendant caused the death.  The
Commonwealth shall use that portion of the video in ways
that minimize any prejudice consistent with its use at the
previous trial of this case.  Further guidance put on the
record.  So the guidance that I am providing is in essence
to use the video the way it was used at the first trial.
There is no reason to do a slow motion or to introduce
stills from that portion of the video.  Put it this way, if
there are any stills from that portion of the video, then I
would like to see them before they are admitted."

9

"introduc[ing] stills."  Second, during jury selection, the judge alerted the venire that "this case will involve some graphic video and some other graphic evidence."  The judge then asked:  "If you feel that viewing that type of evidence would make it hard for you to be a fair juror and make a decision just based on the evidence and the law, please raise your juror card."  Each prospective juror who answered in the affirmative was questioned at sidebar, and all of them were excused.[7]  Lastly, during his final instructions, the judge cautioned the jury that they were not to let their verdict be influenced by the graphic nature of the video evidence.[8]

---

[7] On the first day of empanelment two jurors came forward in response to the question whether graphic evidence would impact their ability to render an impartial verdict.  After further questioning at sidebar, the judge dismissed both jurors.  On the second day of jury empanelment, two more jurors came forward in connection with the question.  These two jurors also were questioned and excused.  On the third and last day of jury selection, five jurors responded affirmatively to the question.  However, the jury were selected before any of these potential jurors were questioned at side bar, and none of them were seated on the jury.

[8] The judge instructed the jury as follows:

"[T]he crime scene video and photographs are graphic and obviously not pleasant.  When you consider this evidence it is important to keep in mind that you cannot make any decision in this case based on sympathy, pity, anger or passion.  Consider these photographs only as they may draw attention to the nature of the injuries to [the victim] or the nature of the incident itself."

The defendant preserved his objection to the admission of exhibits 1 and 35, and we therefore review for prejudicial error.  This requires us to undertake a two-part analysis and ask:  "(1) was there error; and (2) if so, was that error prejudicial."  Commonwealth v. Cruz, 445 Mass. 589, 591 (2005).  An error is not prejudicial if it "did not influence the jury, or had but very slight effect. . . .  But if one cannot say, with fair assurance, after pondering all that happened without striping the erroneous action from the whole, that the judgment was not substantially swayed by the error," then it is prejudicial.  Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).  In conducting our review, we defer to the sound discretion of the trial judge.  See Commonwealth v. Amran, 471 Mass. 354, 358 (2015) ("The question whether the inflammatory quality of a [video recording] outweighs its probative value and precludes its admission is determined in the sound discretion of the trial judge").

The Supreme Judicial Court has often recognized that graphic evidence presents a heightened risk of prejudice.  See Commonwealth v. Walters, 485 Mass. 271, 282 (2020), and cases cited.  However, at the same time, when graphic evidence is "probative of a material issue, the fact that [it] is gruesome, or may have an inflammatory effect on the jury, does not

11

necessarily preclude its admission." Id. See Commonwealth v. Keohane, 444 Mass. 563, 572-573 (2005). In addition, even in instances where the evidence is not sufficiently probative so as to outweigh the risk of prejudice, our cases have held that a verdict of guilty may still stand if the judge has taken appropriate measures to mitigate prejudice. See Walters, supra.

For example, in Walters, 485 Mass. at 282, the court addressed the admissibility of photographs depicting the body of the victim in a state of decomposition with postmortem injuries to the head and face and concluded that one of the autopsy photographs showing the victim's bulging left eye should not have been admitted due to the risk of unfair prejudice. Nonetheless, in that case, the court determined there was no need to disturb the verdict due to the precautionary measures taken by the judge to mitigate the prejudice; and because the overwhelming evidence in the case made the possibility that the photograph had an impact on the jury's deliberations much less likely. Id. at 284. In another case, Commonwealth v. Alleyne, 474 Mass. 771, 780 (2016), the court concluded that the judge did not err in admitting nineteen graphic autopsy photographs depicting thirteen stab wounds to the victim's body, and the effect of decomposition, because while gruesome, the photographs were probative of the Commonwealth's theory that the murder was

12

committed with extreme atrocity and cruelty, and the judge engaged in appropriate measures to mitigate prejudice. Those measures included questioning the venire during jury selection to excuse those jurors who would have difficulty remaining impartial after reviewing the graphic photographs, limiting the number of photographs introduced by the Commonwealth, and providing limiting instructions. Id. at 780-781.

As we have noted, there is no dispute that the evidence is graphic. In addition, we acknowledge that the events which transpired after the defendant left the scene are less probative on the question whether the defendant properly exercised his right of self-defense than the footage of the stabbing itself. Moreover, it is true, as the defendant asserts, that other less inflammatory evidence -- including testimony from the medical examiner -- was available to the Commonwealth to prove the extent of Walton's injuries and the cause of death. That said, the challenged footage had probative value because it did, in fact, show causation and the extent and seriousness of Walton's injuries, thereby providing relevant support for the Commonwealth's theory that the defendant "did not act in proper self-defense" because he used "more force than was reasonably

13

necessary" in the circumstances (citation omitted).

Commonwealth v. Lora, 494 Mass. 235, 242 n.13 (2024).[9]

Moreover, even if we were to conclude that the judge erred, we discern no basis for granting a new trial where the prospective jurors were appropriately screened, the evidence was limited,[10] the Commonwealth did not exploit the contested evidence,[11] and the judge gave a strong cautionary instruction informing the jurors that they should not be swayed by the

---

[9] To establish that the defendant did not act in proper self-defense,

"the Commonwealth must prove at least one of the following propositions beyond a reasonable doubt: (1) the defendant did not have a reasonable ground to believe, and did not believe, that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force; or (2) the defendant had not availed himself of all proper means to avoid physical combat before resorting to the use of deadly force; or (3) the defendant used more force than was reasonably necessary in all the circumstances of the case."

Id., quoting Commonwealth v. Glacken, 451 Mass. 163, 167 (2008).

[10] We are not persuaded, as the defendant suggests, that because the jury had the exhibits available to them during deliberations, that the judge's efforts to limit the jury's exposure to the video recordings was futile.

[11] Contrary to the defendant's contention, the prosecutor did not focus on the contested portions of the video recordings during her closing argument. She did, as the defendant asserts, ask the jury to examine the video footage "frame by frame"; however, the context of that request makes clear that the prosecutor was referring to the portions of the video recordings that depict the stabbing, which the defendant did not challenge.

14

graphic nature of the evidence in determining the defendant's guilt or innocence. In addition, we note there was additional evidence of the defendant's culpability. The defendant immediately left the scene, sought medical treatment from a hospital some distance away rather than from the nearby BMC, and then falsely reported that his head injury was due to a fall. In these circumstances, we conclude that it is unlikely the challenged evidence influenced or substantially swayed the jury's deliberations.[12]

Given our conclusion, the admission of exhibits 37 and 45, to which there was no objection, requires little discussion. It follows that because there was no prejudicial error in admitting exhibits 1 and 35, the admission of exhibits 37 and 45 did not create a substantial risk of a miscarriage of justice. See Commonwealth v. Alphas, 430 Mass. 8, 23 (1999) (Greaney, J., concurring) (prejudicial error standard is "quantitatively more

_____

[12] The defendant also argues that because the first jury could not reach a verdict and the jury that found him guilty reported a deadlock before returning a verdict, it follows that the case was a "close one" and, as such, the risk of prejudice created by the admission of graphic video recordings was increased. That a reasonable (and impartial) juror would have difficulty returning a guilty verdict where, as here, the victim is the first aggressor, is not surprising. Contrary to the defendant's assertion, however, it does not necessarily follow that the jury could not follow the judge's instructions and return a verdict free from any improper influence.

15

favorable to a defendant" than substantial risk of miscarriage of justice standard).

2. _Prosecutor's closing argument_.  At one point in her closing argument, the prosecutor suggested that the defendant did not stab Walton out of fear for his own life but did so because he was a drug dealer and "the only thing [the defendant] was afraid for that day was his reputation"; the defendant "wasn't going to let Mr. Walton make him seem weak."  The defendant did not object and now argues that the comment had no basis in the evidence, improperly asked the jury to infer a motive, and unfairly bolstered the Commonwealth's case.  We conclude there was no error or substantial risk of a miscarriage of justice.

"It is well established that during closing argument, a prosecutor 'may not misstate the evidence or refer to facts not in evidence'" (citation omitted).  _Commonwealth_ v. _Mack_, 482 Mass. 311, 322 (2019).  However, a prosecutor is "entitled to marshal the evidence and suggest inferences that the jury may draw from it" (citation omitted).  _Id_.  "The inference 'need not be necessary and inescapable, only reasonable and possible,' . . . viewed in light of the entire argument, the judge's instruction to the jury, and the evidence at trial."

Commonwealth v. Goddard, 476 Mass. 443, 449-450 (2017), quoting Commonwealth v. Jones, 432 Mass. 623, 628 (2000).

Based on the evidence, and taken in context, the challenged remark was not improper.  It was permissible for the prosecutor to suggest the defendant had a motive other than to defend himself when he stabbed Walton.  The defendant testified that the area where the stabbing took place was a dangerous one, made "significantly" more dangerous by selling drugs (including crack cocaine), which the defendant testified he did there for ten hours a day.  Given this testimony, it was not unreasonable to ask the jury to infer that the defendant would want to appear formidable while engaged in a fight.  In any event, the comment amounted to a minor point in a closing argument that otherwise properly focused on the evidence.  In addition, the judge instructed the jury that closing arguments are not evidence three times, mitigating the risk of any prejudice to the defendant.  Cf. Commonwealth v. Santana, 477 Mass. 610, 628 (2017) (applying substantial likelihood of miscarriage of justice standard).  In sum, we are not persuaded that the jury

would have been swayed to the defendant's detriment by the remark at issue.  Commonwealth v. Souza, 492 Mass. 615, 636 (2023).

Judgment affirmed.

By the Court (Vuono, Shin & Smyth, JJ.[13]),

_Paul Little_

Clerk

Entered:  March 12, 2026.

---

[13] The panelists are listed in order of seniority.